603 So.2d 368 (1991)
Judy M. HANEY
v.
STATE.
7 Div. 148.
Court of Criminal Appeals of Alabama.
March 29, 1991.
On Return to Remand June 28, 1991.
Rehearing Denied November 15, 1991.
*372 David Schoen and Bryan A. Stevenson, Montgomery, and Charlotte Norby and Stephen B. Bright, Atlanta, Ga., for appellant.
Don Siegelman, Atty. Gen., and William D. Little and P. David Bjurberg, Asst. Attys. Gen., for appellee.
James H. Evans, Atty. Gen., and William D. Little and P. David Bjurberg, Asst. Attys. Gen., on rehearing, for appellee.
PATTERSON, Presiding Judge.
Appellant, Judy M. Haney, was indicted on November 6, 1987, in Talladega County, in a two-count indictment for the capital offenses of murder for hire, in violation of § 13A-5-40(a)(7), and murder committed during a robbery in the first degree, § 13A-5-40(a)(2), Code of Alabama 1975. The indictment reads, in part, as follows:
"COUNT ONE:
"The Grand Jury of said County charge that before the finding of this Indictment and subsequent to July 1, 1981, Judy M. Haney ... did intentionally cause the death of Jerry Wayne Haney by shooting him with a shotgun for hire, to-wit: that Judy M. Haney hired Jerry Paul Henderson to kill Jerry Wayne Haney for Three Thousand Dollars ($3,000.00), in violation of § 13A-5-40(a)(7) of the Code of Alabama, 1975....
"COUNT TWO:
"The Grand Jury of said County charge that before the finding of this Indictment and subsequent to July 1, 1981, the said Judy M. Haney ... did intentionally cause the death of Jerry Wayne Haney by shooting him with a shotgun and Judy M. Haney caused said death during the time that Judy M. Haney was in the course of committing a theft of, to-wit: Eighty Dollars ($80.00) in lawful currency of the United States of America, composed of, to-wit: at least one Twenty-Dollar Bill, at least one Ten-Dollar Bill, at least one Five-Dollar Bill, a better description of which is to the Grand Jury unknown otherwise than stated, of the value of, to-wit: $80.00, the property of Jerry Wayne Haney, did threaten the imminent use of force *373 against the person of Jerry Wayne Haney with the intent to compel acquiescence to the taking of or escaping with said property and at the time caused serious physical injury to the said Jerry Wayne Haney, in violation of § 13A-5-40(a)(2) of the Code of Alabama, 1975...."
At arraignment, Haney pleaded not guilty and not guilty by reason of mental disease or defect. On October 24, 1988, a jury found her guilty of both capital offenses charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-43 through -46, and the jury returned an advisory verdict recommending the death penalty. Ten jurors recommended the death penalty, and two recommended a sentence of life imprisonment without the possibility of parole.[1] Thereafter, the trial court held another sentencing hearing, in accordance with §§ 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced Haney to death.
The state's evidence showed that appellant, Judy M. Haney; her husband, Jerry Wayne Haney, the victim of these crimes; and their two children, Tonya and Gary, resided in a rural area near Talladega, Alabama. Shortly after Christmas 1983, appellant made several telephone calls to her sister, Martha Henderson, who lived in Calhoun, Georgia, telling Martha that she was having "problems" with her husband and that she and the children would like to visit Martha in Calhoun "to get away for a while." On December 28, 1983, Martha and another sister, Kathy Milstead, drove to the Haney home and brought appellant and her two children to the Henderson home in Calhoun. Martha testified that, while she was in the Haney home, appellant and her husband appeared to act friendly toward each other. Before departing for Calhoun, appellant took Martha aside; told Martha that she had told her husband that she wanted to go to Calhoun to see her sick aunt; and asked Martha, in the event appellant's husband said anything about it, to "stick" with that story. Upon arriving in Calhoun, appellant called her husband and told him that they had arrived safely. Over the next few days, appellant talked with her husband several times on the telephone.
After arriving in Calhoun, appellant explained to Martha that the reason she wanted her husband to think she was going to see her sick aunt was that she was afraid that he would want to go along to visit with the Hendersons. Appellant also told Martha that she had withdrawn and spent a considerable amount of money from a joint savings account, that her husband did not know about it, and that she was afraid of what he might do when he discovered it. She also told Martha that her husband was having an affair with "a lady named Louise."
On December 31, 1983, appellant told Martha and Martha's husband, Jerry Paul Henderson, that she did not want to return home because of her fear of what her husband might do when he discovered the money missing from the savings account. She told the Hendersons, "... I would do anything if I could just get rid of him, just get him out of my life." Jerry Paul Henderson replied as follows: "What would you do to get rid of him? You know, I might be able to help you.... Would you be willing to pay?" In turn, appellant said: "Well I've got $3,000.00.... That's all I've got. I would pay that." Henderson told appellant that he knew someone who might be able to help, and she told him to "check into it and see." Henderson left and, a short time later returned. He told appellant that everything had been arranged; he asked her if she was sure that that was what she wanted, and she answered "yes." Henderson borrowed some highpowered shotgun shells from a friend. He told appellant and Martha that he was going to Talladega and kill Haney. Appellant drew a map of the area *374 around her home, showing where Henderson could park his truck and approach the Haney home undetected. Appellant told Henderson that her husband had money in his wallet and that he should get the wallet and "bank book." She gave him $8.00 for travel expenses.
Henderson left Calhoun and drove to the Haney home. He parked his truck away from the Haney home and walked to the house. He knocked on the door, and Jerry Wayne Haney came to the door. He told Haney that he "ran out of gas" nearby while bringing "Judy and the kids" home and asked him to help him get some gas. Haney invited Henderson in so that he could warm by the fire while Haney dressed. After staying inside for a while, Henderson told Haney that he was hot and that he would wait for him outside. He waited outside, and when Haney stepped out of the house, Henderson shot him in the stomach with a shotgun. The blast knocked Haney to the ground, and while he was on the ground, Henderson shot Haney again, grazing the area around Haney's ear. Haney got to his feet and ran around a hedge row, trying to escape. He fell on the steps of his house and said, "Don't shoot me any more. Get help." Henderson shot Haney again, this time point-blank in the face, and departed.
On his return trip, Henderson stopped at a Waffle House restaurant in Oxford, Alabama, about 11:00 p.m., called his home, and told appellant and Martha that Haney had been killed. When appellant talked with Henderson on the telephone, she asked him if he had gotten the "bank book." Henderson arrived at his home in Calhoun around 3:30 a.m. Appellant had taken the victim's "insurance card," Social Security card, driver's license, and around $80.00 in money from his wallet. She gave Henderson $25.00 for gasoline and kept the rest. The remaining contents of the wallet were burned in the kitchen sink. The wallet was later placed in a trash dumpster, and the shotgun was thrown into a nearby river. Neither was ever found.
Not having heard anything the following day and being concerned that something had gone wrong, appellant called the victim's brother, Billy Haney, an officer with the Talladega Police Department, and told him that her husband was supposed to call her and to come get her and that she had not heard from him. She told Billy that she had been unable to reach him by telephone, and she asked him to check on her husband and call her back. Henderson assured her that there was no way the victim could be alive, since he had shot him in the head. Billy Haney discovered the body and, after notifying the authorities, called Martha and told her that the victim was dead.
Appellant paid Henderson $3,000, in three installments, for killing her husband. She gave him $300 on two occasions, and the balance was paid from the proceeds of a loan she obtained after executing a second mortgage on her home in Talladega County which she had inherited from the victim. Appellant and the Hendersons agreed that they would "keep their mouth[s] shut" about the killing and "stick" to their story that they were all together at the Henderson residence in Calhoun on the night of the murder. About a month after the murder, appellant called Henderson and told him that an investigator might come to Calhoun and question him about owning a shotgun. She advised him to make up an excuse for not having the gun. Henderson faked a burglary of his truck to explain his missing shotgun.
The investigation of the victim's death continued for three years and eight months before an arrest was made. A break in the investigation came in the fall of 1987, when Martha Henderson, having separated from Jerry Paul Henderson, agreed to cooperate with the state, assisted the state in its investigation, and made a statement giving the details of the crimes. The arrest of appellant and Henderson for the commission of the capital crimes followed shortly thereafter.[2]
*375 Appellant testified in her own behalf. She admitted paying Henderson $3,000 to kill her husband. She also admitted giving him instructions on how to approach her home without being observed, but denied drawing him a map. She also denied telling him to get her husband's wallet and "bank book," but she testified that she took her husband's social security card from his wallet and was given $20 from the wallet by Henderson.
Dr. Michael Holt, a psychologist, was called, as a defense witness, to support appellant's insanity plea. However, he testified that, even though he had found that appellant at the time of the commission of the crimes, was suffering from a psychological defect, which he characterized as "spouse abuse syndrome," she nevertheless knew right from wrong and possessed the capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law. § 13A-3-1.
Dr. Doug McKeown, a psychologist, was called by the state in rebuttal. He agreed with Dr. Holt that, at the time of the commission of the offenses, appellant possessed the capacity to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law. However, he disagreed with Dr. Holt's finding that appellant was suffering from a psychological defect. He found that there was no evidence to suggest that appellant had such a defect or would not have been able to fully understand her actions, behavior and decisions, at the time. He concluded that she was psychologically normal.
While appellant argued that she lacked the necessary intent to commit the crimes because her judgment was allegedly impaired by "spouse abuse syndrome" and fear of her husband, she appeared to concentrate the main thrust of her defense toward the sentencing phase by appealing to the court and jury to spare her life because of years of alleged torment by an abusive husband.
Appellant raises numerous issues. She was represented at trial by appointed counsel. The attorneys representing her at trial were relieved of their appointment after the trial, and she is now represented by retained counsel on appeal.

I.
Appellant contends that the trial court committed reversible error by denying her motion for a new trial based upon the assertion that the state had used perjured testimony to obtain her conviction.
During the guilt phase, appellant testified that she and her children had been physically abused by her husband on numerous occasions during their marriage. She testified that, on one occasion in 1977, her husband struck her in the face, fracturing her nose. Her daughter, Tonya, testified that she witnessed this incident. Her husband took the children to his brother's home and carried appellant to the emergency room of Citizens Hospital of Talladega for treatment.
Appellant and Tonya testified about another incident which occurred when Tonya was about eight years of age. Tonya and her father were playing, and Tonya accidently slapped him. According to appellant and Tonya, the victim lost his temper and threw Tonya against a concrete well curb, fracturing her elbow. She was treated at Citizens Hospital for the injury.
Both parties subpoenaed the hospital records for the trial. In rebuttal to appellant's and Tonya's testimony, the state called Barbara Jean Barnett, the director of medical records at the Citizens Hospital, who testified that she had searched the hospital's records, in an effort to locate records and X-rays pertaining to the injuries described above, and could find none. She found numerous other records of treatment of members of the Haney family over the years, but none showing treatment for the injuries to appellant and Tonya described above. Barnett testified that it was possible that there were other records *376 pertaining to the Haneys that she did not find because of a possibility that they were misfiled and that a further search could possibly uncover other Haney records. In his closing argument to the jury, the prosecuting attorney, in an effort to cast doubt upon appellant's and Tonya's credibility, commented on the failure of the hospital records to show the treatment for the broken nose and the fractured elbow.
Subsequent to the trial and convictions, defense counsel prevailed upon Barnett to search her hospital records again. She did so and discovered outpatient records showing three additional instances of treatment. She testified to this effect at the hearing on the motion for a new trial, and the additional records were introduced and made a part of the record. The records reflect that Tonya received an X-ray at the Citizens Hospital on March 28, 1977. The record does not disclose the reason for the X-ray. The records also disclose that she was X-rayed again on April 19, 1977, and that a cast was removed. She was attended by Dr. J.M. Vavich. The records further disclose that appellant was an outpatient at the hospital on August 21, 1979, and received an X-ray. The record reflects that appellant had "slipped and fell against a brick column" and that the injury was a "contusion of nose and left eye orbit." She was attended by a Dr. Johnston and a nurse B. Young. The record further shows that appellant was to use ice packs overnight and see a Dr. Lambert the following morning.
The law applicable to this issue is found in Ex parte Frazier, 562 So.2d 560, 570 (Ala.1989), which is, as follows:
"[T]he following standard should be used in death penalty cases: In order to grant a motion for a new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness.
"A few comments concerning these new standards are in order. With regard to both of them, a presumption of correctness will continue to be indulged in favor of the trial court's factual findings, and the trial court's ruling on the motion will be upheld on appeal unless it is clearly erroneous."
Considering the record before us in reference to this issue, we conclude, contrary to appellant's assertion, that the testimony of Barnett was not false. She made it clear that there was a possibility of the existence of other hospital records pertaining to the Haneys that she had not found. She attributed this possibility to the confused state of the records at Citizens Hospital. She described the record-keeping system as being changed from time to time; in fact, she said, during one period there was no record-keeping system at all. Moreover, there appears to have been some confusion as to whether she was to search outpatient records as well as inpatient records in responding to the subpoena duces tecum. It took Barnett several days of searching at a storage location away from the hospital before she found the additional records. Contrary to the assertions of appellant, we find nothing in the record to support a conclusion that Barnett intentionally lied about the records or that the state was a party to the use of perjured testimony. From our analysis of the testimony, we conclude that, not only was it not perjured, it was not false.
We also conclude that, if the jury had had the additional evidence of the records, there is not a significant chance that it would have reached a different result. If the records had been available to the defense for admission into evidence, they are not as clearly corroborative as appellant urges. The hospital records, in and of themselves, do not show physical abuse perpetrated on appellant and Tonya by the victim. The record pertaining to Tonya does not show the reason for her X-ray and cast, and the record pertaining to appellant does not show a broken nose but a lacerated one and indicates that the reason for her *377 injury was falling against a brick column. The hospital records to some extent contradict appellant's testimony. Moreover, appellant's testimony and reliance on having been abused were clearly impeached without the prosecution's use of the absence of the hospital records. Appellant's sister Martha contradicted appellant's testimony that she grew up in a violent home and had been abused by her parents, for her sister painted a different picture of their early home life. The findings of the psychologists raise doubts about appellant's testimony of abuse. The psychologists were surprised by the test results that indicated how little appellant had been affected by the abuse she described. In addition, 20 years of records of the Department of Human Resources of Talladega County, the agency that would ordinarily receive complaints of child abuse, were searched, and no records were found reporting child abuse involving any member of the Haney family. We also note the evidence that appellant and the victim appeared to be on friendly terms and were affectionate toward each other when appellant left home to visit her sister in Georgia. Appellant's cold and calculating attitude toward the murder, her efforts to avoid detection, the use of her daughter in an attempt to cast suspicion of the murder upon an innocent man, and her continuous pattern of lies told over a period of years could not have endeared her to the jury; rather, her testimony was rendered highly suspect. Also casting doubt on appellant's claim of spousal abuse were the relative size and physical condition of the parties. They both were apparently in reasonably good health. The victim was apparently of average size, and appellant was 5'8" in height and weighed 175 pounds. There was ample evidence from which the jury could have reasonably concluded that appellant's and Tonya's testimony about abuse at the hands of the victim was overstated and exaggerated. In our opinion, appellant's credibility as a witness had been so undermined during the trial that, even if the additional hospital records had been introduced into evidence, they would not have had any bearing upon the outcome of the case.
Finally, assuming the two incidents occurred, appellant was certainly aware that she and her daughter had been treated at the hospital for a lacerated nose and a possible arm injury. She advised her attorney of this over three months prior to the trial. Still, appellant did not seek a subpoena of the records until the trial commenced and made no attempt to prove the hospital treatment by calling the doctors and nurses who attended appellant and her daughter and whose names were either known to appellant or could have been easily ascertained. Instead, she chose not to challenge the custodian of the hospital records at trial, but to do so later, in an attempt to obtain a reversal and a new trial. This decision tends to diminish the importance appellant places upon the hospital records evidence.
For the reasons stated above, we cannot say that the trial court's ruling on the motion for a new trial was clearly erroneous. Thus, we find no merit to this contention.

II.
Appellant next contends that she was denied her constitutional right to counsel when one of her attorneys was incarcerated, for contempt of court, in the Talladega City jail overnight during the trial. In arguing that this action constituted reversible error, she relies primarily on Geders v. United States, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), and Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989).
Shortly after court recommenced on the fourth day of trial, the prosecuting attorney, observing that one of the defense counsel was under the influence of alcohol, reported that fact to the trial court. The trial court also observed that counsel was under the influence of alcohol, and appellant's other counsel, in effect, confirmed that his co-counsel was in that condition. All parties agreed that subject counsel had been sober and had performed satisfactorily during the first three days of trial. The offending counsel was not the lead counsel in the case, but had been appointed after *378 most of the preliminary proceedings had taken place and at the request of lead counsel to assist in the trial and possible appeal. Appellant declined to continue with the trial without both of her counsel, and the trial court recessed court until the following morning. Immediately after recessing, the court held a contempt hearing, found counsel guilty of appearing in court while under the influence of alcohol, cited counsel for contempt, and sentenced him to be incarcerated in the city jail overnight. The jury was not present during any of the proceedings. The trial resumed the following morning with the subject attorney present and participating, and without any reference to the incident. No objections were made to the proceedings and at no time, after the trial resumed, did either defense counsel or appellant suggest to the trial court that they had wished to confer during the overnight recess or make it known that counsel was prevented because of incarceration from performing any defense function. The issue is raised for the first time on appeal.
We begin our discussion with the well-established principle: "Generally ..., in accordance with the constitutional guaranties which entitle an accused assistance of counsel, an accused has the right to a reasonable opportunity to communicate and consult freely with his attorney prior to and during trial, and during trial recess periods." 21A Am.Jur.2d, Criminal Law § 737 (1981) (footnotes omitted). We believe that the cases relied upon by appellant to support her contention that she was denied her constitutional right to counsel are distinguishable from the instant case. In Geders, the United States Supreme Court held that a trial court order preventing the accused from consulting with counsel during a 17-hour overnight recess between the accused's direct and cross-examination violated the accused's rights under the Sixth Amendment. In Perry v. Leeke, the Supreme Court held that the trial court did not violate the accused's Sixth Amendment rights where the court declared a 15-minute recess at the conclusion of the accused's direct testimony and ordered that the accused not talk to his attorney during the recess. The Perry Court found Geders to be distinguishable and reaffirmed its holding in Geders. The Court further held that a showing of prejudice was not an essential component of a violation of the Geders rule and that prejudice need not be shown in order to prove reversible error where a court order has prevented an accused from having any communication with counsel during an overnight recess.
In the case before us, unlike Geders and Perry v. Leeke, the trial court did not order appellant not to consult with her counsel who was incarcerated. The question to be resolved here is whether the action of the trial court did, in fact, deprive appellant of her right to counsel.
"[It] is one thing to say that a defendant who has been deprived of the guiding hand of counsel need not demonstrate the prejudicial effect of that deprivation; it is quite another to say that he need not show that the challenged order deprived him of counsel he would otherwise have received."
Bailey v. Redman, 657 F.2d 21, 24 (3d Cir.1981), cert, denied, 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982) (quoting Bailey v. Redman, 502 F.Supp. 313, 316 (D.Del.1980)). In order for appellant to prevail on this issue, she must demonstrate that the action of the trial court deprived her of a constitutional right which she sought to exercise. See Stubbs v. Borderkircher, 689 F.2d 1205 (4th Cir.1982), cert, denied, 461 U.S. 907, 103 S.Ct. 1879, 76 L.Ed.2d 810 (1983). However, there is no evidence that she made any attempt to confer with incarcerated counsel or had any desire to do so. There is also no evidence that the incarceration of counsel interfered, in any manner, with the conduct of the defense or prevented counsel from performing any act in reference to the defense that he desired to perform. We find no evidence that appellant was deprived of a right that she sought to exercise. There is no merit in this contention.

III.
Appellant contends that the trial court incorrectly instructed the jury, in the *379 sentencing phase of the trial, that it was to consider, as proven beyond a reasonable doubt by virtue of its guilty verdict, the aggravating circumstance under § 13A-5-49(6): that the capital offense of murder for hire, for which she had been found guilty, was committed for pecuniary gain. Appellant argues that this aggravating circumstance should not have been applied to her since it requires proof that the defendant received something of pecuniary value and that the pecuniary consideration was the impetus for the murder. She argues that she hired Henderson to kill her husband, not for her personal pecuniary gain, but because of fear of abuse.
In the sentencing phase, the jury was instructed in reference to aggravating circumstances, as follows:
"Now the issues of this sentence hearing concern the circumstances of aggravation and circumstances of mitigation that you should consider and weigh against each other in deciding what the proper punishment in this case is to be. You can also consider in arriving at your verdict all of the evidence that was presented during the guilt phase of the trial that was relevant to the existence of any aggravating or mitigating circumstances. That is you can consider evidence that you have heard during the past several days in the trial of this case in arriving at your verdict.
"Now the burden is upon the State in this case and in this phase of the case to prove beyond a reasonable doubt and to a moral certainty that one or more aggravating circumstances exist before you would be authorized to recommend the death sentence. Provided however, it is set out in Section 13A-5-45(e) of the Alabama Code that any aggravating circumstance which the verdict convicting the defendant established and proved beyond a reasonable doubt at trial shall be considered as proved beyond a reasonable doubt for the purposes of the sentencing hearing. In respect to this, the State has proved beyond a reasonable doubt the aggravating circumstance of murder for hire for pecuniary gain and also murder during robbery. That was done by your verdict in this case at the conclusion of the guilt stage today. The aggravating circumstances that are set out in Section 13A-5-49 of the Code of Alabama, and there are eight of them, however, you will only be concerned with three. These are number 4, number 6, and number 8. Number 4 is concerned with a capital offense while the defendant was engaged in a robbery and number 6 is concerned with a capital offense that was committed for pecuniary gain. These two aggravating circumstances are as a matter of law proved by your verdict of guilt today as I have just mentioned to you."
Appellant's argument completely ignores that our capital murder statute contemplates that certain aggravating circumstances will be established by certain capital verdicts. This practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap." This practice has been upheld. See Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (upholding Louisiana's capital offense statute in which the intent to kill more than one person is both an element of the capital offense and an aggravating circumstance); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987) (double-counting or overlap does not rise to a constitutional level); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert, denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (allowing the jury and trial court, in capital case, to find, as an aggravating circumstance for sentencing purposes, the same aggravation alleged in the indictment is not unconstitutional); Lawhorn v. State, 581 So.2d 1159 (Ala.Cr.App.1990) (the finding and consideration of a relevant aggravating circumstance is not precluded by its inclusion in the definition of the capital offense charged); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (overlap is constitutionally permissible).
"The use of `aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death eligible *380 persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase."
Lowenfield v. Phelps, 484 U.S. at 244-45, 108 S.Ct. at 554.
Our statutes that allow double-counting recognize that the jury, by its guilty verdict, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt.
Section 13A-5-45(e) provides, as follows:
"At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstances which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
Section 13A-5-50 provides, as follows:
"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.
"By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40."
Accordingly, we conclude that the aggravating circumstance that "[t]he capital offense was committed for pecuniary gain" was established, as a matter of law, by appellant's conviction of the capital crime of murder for hire, and the trial court correctly so charged the jury.
In so holding, we necessarily find that the aggravating circumstance was correctly applied to her even though she was the hirer and not the person hired and was convicted of the crime pursuant to the complicity statute, § 13A-2-23. We think the aggravating circumstance should be considered as established where the defendant is convicted of the capital offense as an accomplice-hirer. We do not think the legislature intended to make a distinction between the hirer and the person hired in a murder for hire or contract for hire situation. The statute does not distinguish between the hirer and the hiree, but simply provides that the aggravating circumstance arises if the "offense was committed for pecuniary gain." Here the offense was clearly committed for pecuniary gain. In the eyes of the law, the hirer is as much to be abhorred as the hiree, and, here, appellant is as guilty as her brother-in-law, who received the money and who actually did the killing. Accordingly, we read § 13A-5-45(e) to mean that, where a defendant has been convicted of the capital offense of murder for hire even though that person was the hirer and was convicted of the offense as an accomplice pursuant to the complicity statute, the aggravating circumstance that the capital offense was committed for pecuniary gain is established as a matter of law.
In the recent case of Ex parte Bankhead, 585 So.2d 112 (Ala.1991), the Alabama Supreme Court addressed this very issue. There, the defendant argued that a finding of the "especially heinous, atrocious or cruel" aggravating circumstance could be based only on the acts of the defendant, and not those of an accomplice. The Supreme Court rejected this argument, holding in effect that the aggravating circumstance is that "[t]he capital offense was especially heinous, atrocious or cruel," whether or not the acts constituting the circumstance were the defendant's acts or those of an accomplice. (Emphasis added.) The Court stated the following:
"In § 13A-5-49(8), the emphasis is on the manner of the killing, not on the defendant's actual participation. In the sentencing phase of a bifurcated trial under § 13A-5-43, the jury has already determined that the crime is a capital *381 offense. That is, the jury has determined that the killing was intentional, because an intentional killing is a necessary element of capital murder. The State does not have to prove that the defendant inflicted the wounds or assign any particular wound to the defendant. Once the jury determines that the defendant has committed a capital offense, the sentencing phase can begin. It is during the sentencing phase that the jury considers whether `the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.' § 13A-5-49(8)." 585 So.2d at 125.
While Bankhead deals with a different statutory aggravating circumstance than the one we are concerned with here, the legal principle and rationale involved are the same. Here, the jury found appellant guilty of the capital offense of murder for hire. Henderson, her accomplice, murdered the victim because of appellant's offer of pecuniary gain. Following the rationale of Bankhead, the state did not have to prove that appellant benefited financially from the commission of the offense, but only that the crime itself was committed for pecuniary gain. We find Bankhead dispositive of this issue.
Appellant relies principally on Tomlin v. State, 516 So.2d 790 (Ala.Cr.App. 1986), aff'd, 516 So.2d 797 (Ala.1987), to support her contention. Tomlin is distinguishable from the case at bar. The court in Tomlin did not directly address the issue presented here, but more importantly, the case was decided under our old capital murder statute, which did not contain a provision such as § 13A-5-50 authorizing, when appropriate, a finding of the existence of an aggravating circumstance based on a verdict of guilty of a capital offense alone. Appellant cites cases from other jurisdictions in support of her contention. We have examined these cases and find that they are factually distinguishable from the instant case.

IV.
Appellant contends that the trial court committed reversible error in the sentencing phase of the trial by considering a victim impact statement, which she argues was, in violation of the principles established in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).
In the process of determining sentence, the trial court, in complying with § 13A-5-47(b), ordered and received a pre-sentence investigation report from the court probation and parole officer. It contained, inter alia, a victim impact statement. The statement described the emotional impact of the crimes on the victim's family and set forth the family members' opinions and characterizations of the crimes and appellant. The Court in Booth v. Maryland, in considering the effect of a victim impact statement, which is similar to the instant statement, on the jury in its sentencing, held that such information was "irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner," 482 U.S. at 503, 107 S.Ct. at 2533.
The state contends that Booth v. Maryland is distinguishable from the case at bar since, in Booth, the victim impact statement was before the jury in the jury's sentencing phase, while in the instant case, only the trial court had the statement before it in its sentencing phase. The state relies on Ex parte Martin, 548 So.2d 496 (Ala.), cert, denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989), to support its contention. In Martin, the Alabama Supreme Court held that the introduction of a victim impact statement was not reversible error where the statement was presented to the trial court only and not to the jury. While the Martin court seemed to place some importance on the fact that only a small portion of the report involved the victim impact statement, we agree with the state that it is more likely the holding is grounded on the premise that a trial court is presumed to disregard improper factors in sentencing. See Lightbourne v. Dugger, 829 F.2d 1012 (11th Cir.1987), cert, denied, 488 U.S. 934, 109 S.Ct. 329, 102 *382 L.Ed.2d 346 (1988). However, we cannot agree with the state's assertion that Booth v. Maryland is inapplicable just because it is the trial court that is determining the sentence in a death penalty case. "The risk of arbitrary and capricious decisions exists whether the sentence is determined by a jury or a judge." State v. Charboneau, 116 Idaho 129, 774 P.2d 299, 320 (1989).
The trial court, in its findings and determination of sentence, states, "The Court has carefully read, studied and considered the Presentence Report before arriving at the final decision determining the sentence herein." We cannot tell from the record whether the trial court relied on the victim impact statement, which was a part of the pre-sentence report, in determining the sentence. The victim impact statement was substantial and, as we noted, similar in content to the statement condemned in Booth v. Maryland. It should not have been considered by the trial court in sentencing, if in fact it was considered. While we might be inclined to rely on the presumption that a trial court is presumed to have disregarded improper factors in sentencing in non-capital cases, we are reluctant to do so in a death penalty case. We deem it best to remand this case to the trial court, as we did in Pierce v. State, 576 So.2d 236 (Ala.Cr.App.1990), with instructions to resentence appellant, without considering the victim impact statement, and issue new written findings.
We addressed the admission into evidence of the victim impact statement in Lawhorn v. State; Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990); and Henderson v. State, 584 So.2d 841 (Ala.Cr.App.1988), in the light of Booth v. Maryland, and in each case found no reversible error; however, those cases are factually distinguishable from the case at bar.

V.
Appellant contends that she was denied her constitutional right to cross-examine the author of the presentence report or any of the persons whose statements were contained in it.
Section 13A-5-47(b), provides as follows:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
The statute expressly provides that the presentence report be made available to the defendant and that the defendant be permitted to "respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute." However, it is clear that appellant never made a request or attempted, in any manner, to cross-examine the author of the presentence report or any person whose statement was contained in the report. A copy of the presentence report was served on appellant four days prior to the sentencing hearing. On the day of the hearing, appellant filed a motion facially attacking the constitutionality of the capital murder statute; however, contrary to her assertions on appeal, she did not request to cross-examine any witnesses in her motion. No right to cross-examine was denied, as is contended. Appellant would have been entitled to call, as a witness, any person who could give information about the report, including its author, but apparently chose not to do so. At the sentencing hearing, the trial court specifically asked appellant if she had anything she wanted to present to the court, and she stated through her attorney that she did not. In arguing this contention, appellant mainly relies on Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); Proffitt v. Wainwright, 685 F.2d 1227 (11th Cir.1982), cert, denied, 464 U.S. 1002, 1003, 104 S.Ct. *383 508, 509, 78 L.Ed.2d 697, 698; Ex parte Clisby, 456 So.2d 95 (Ala.1983). However, these cases are factually distinguishable from the case at bar.
We find no merit in this contention.

VI.
Appellant contends that she was denied an individualized determination of the appropriate penalty for her capital conviction by the trial court's consideration of the presentence report, which apparently assumed that nonstatutory mitigating circumstances could not be considered in sentencing. She argues that the trial court's action in this regard violated her Eighth and Fourteenth Amendment rights, necessitating a new sentencing hearing. In advancing this argument, appellant assumes that the questioned recommendation in the presentence report, which is as follows, was considered by the trial court in determining sentence.
"Mitigating Circumstances: Although Ms. Haney stated that she was in fear of her life and that Jerry Haney had abused her and her children, under Alabama Code 13A-5-51 there are seven paragraphs that specify what are mitigating circumstances. In my opinion none of these mitigating circumstances would apply in this case."
Did the trial court consider the conclusion expressed in the report concerning mitigating circumstances? We think not. The findings of the trial court clearly show that it did not consider the conclusion reached by the author of the report, but specifically considered the existence or non-existence of non-statutory mitigating circumstances, including appellant's character and record, the circumstances of the offenses, and other matters, as required by § 13A-5-52. The court's findings in this regard are as follows:
"The Court has made a diligent search under the provisions of Section 13A-5-52, the evidence offered by the defendant, and aspects of presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character on [sic] record or any circumstance of the offenses for which she has been convicted that would constitute a mitigating circumstance and finds that the only mitigating circumstance, statutory or non-statutory, is the absence of a prior criminal record."
We find no merit to this contention.

VII.
Appellant contends that her rights against self-incrimination were violated by the inclusion of her allegedly unwarned statement in the presentence report and the consideration of that statement by the trial court in determining her sentence. On the day of appellant's arrest for the capital crimes, she made a statement to the chief investigator in the case, Dennis Surrett. The substance of this statement was set out in the pre-sentence report and is as follows:
"Ms. Haney made a statement to Dennis Surrett on September 12, 1987. At that time she basically stated the facts that have been previously outlined. She stated that Jerry had beaten her up and they were constantly having trouble. She stated that he had got to where he beat the kids violently. She claims that on that Wednesday afternoon that she left Alabama that he had tried to kill her by placing a broom handle on her throat and standing on it on both sides until she turned blue and almost lost consciousness. She stated that this occurred about 2:30 in the afternoon because the kids had not come home from school.... She stated that when Jerry Henderson returned to Georgia that he had Jerry's flashlight and his billfold. She claims that she took the Social Security card and that Jerry gave her twenty dollars and kept some of the money himself and then burned everything that was in the billfold. She admitted to calling Billy Haney and sending him over knowing full well that he would find his brother dead. She did state that she did not realize that Jerry Henderson had done the killing himself, she thought that he had hired someone to do the job." *384 While appellant claims, in her brief, that her statement was made without the Miranda warnings, the record does not disclose whether they were given or not, or even if they were required.
There is no distinction between the guilt and penalty phases of a capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). We have reviewed the statement and, upon comparing it with appellant's testimony at trial, we find the facts alleged in the statement to be practically identical to her testimony at trial. For this reason, we fail to see how the inclusion of this information in the presentence statement has harmed appellant. Her version of the crimes and her reasons for participating in them are the same in both instances. The facts in the statement were available to the trial court from other evidence in the record. We find that the inclusion of the statement in the presentence report was harmless. See Thompson v. State, 503 So.2d 871 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.1987), cert, denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).

VIII.
Appellant contends that the trial court "invaded the jury's province and denied appellant an individualized determination of the appropriate penalty for her capital crime[s] when it directed the jury to find two statutory aggravating circumstances that were purportedly proved as a matter of law by the verdict[s] during the guilt phase." She argues that the court denied her due process of law and Eighth Amendment rights when it directed the jury to find two statutory aggravating circumstances.
At the jury sentencing proceedings, the trial court instructed the jury that its verdicts had established the two aggravating circumstances that the capital offense was committed for pecuniary gain, § 13A-5-49(6), and that the capital offense was committed during a robbery in the first degree, § 13A-5-49(4). See § 13A-5-45(e). From our discussion in part III, we hold to be without merit appellant's argument that this instruction invaded the province of the jury in that it directed a verdict on matters the jury was supposed to determine. During the guilt phase, the jury considered the evidence that pertained to these aggravating circumstances and that was offered by both the prosecution and the defense and, by its guilty verdicts, of necessity, found them to exist. Moreover, the right of appellant to present evidence on the issue of the existence or non-existence of the aggravating circumstances in question was clearly satisfied during the guilt-phase of the trial.
Appellant further argues that the Eighth Amendment prohibits basing the finding of these aggravating circumstances on the guilty verdicts because her guilt was established without a finding of her intent to commit the crimes. We find no merit in this argument. The trial court, in the guilt phase, correctly charged the jury on the particularized intent required of appellant in each of the crimes charged. The evidence before the jury showed that appellant agreed to pay Henderson $3,000 to kill her husband and that she instructed Henderson to take her husband's wallet and "bank book." This evidence establishes the particularized intent of appellant that the murder be committed for hire and that it be committed in the carrying out of a robbery. There was sufficient evidence from which a rational jury could conclude that appellant possessed the required specific intent necessary to find her guilty of the capital charges. See Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.1985), cert, denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
Appellant further argues that the court's instruction on the pecuniary gain aggravating circumstance violated her Eighth Amendment right to an individualized determination of the appropriate penalty because it used the "legal fiction" of the conspiracy doctrine to prove that that circumstance could be applied to her. She argues that there is a "moral" difference between the culpability of a woman who *385 hires a hit man to kill her allegedly abusive husband and the culpability of the hit man who killed for money. She contends that the instruction did not permit the jury to make the kind of reasoned moral judgment about the appropriate penalty that the Eighth Amendment requires.
We consider appellant's assertion that this instruction prohibited the jury from considering her particular culpability to be without merit, because appellant's evidence that she murdered her husband because of the abuse he had heaped upon her and their children over the years was a proper matter for the jury to consider in mitigation in arriving at its advisory sentence. The trial court's instruction on the jury's consideration of non-statutory mitigating circumstances clearly allowed the jury to consider her motivation of abuse, because the court instructed as follows:
"In addition to the [statutory] mitigating circumstances previously specified, mitigating circumstances shall include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for ... her sentence [of] imprisonment without parole instead of death. Mitigating circumstances however considered by you should be based upon the evidence that you have heard in this case."
When aggravating circumstances which are established by guilty verdicts act as a means of narrowing the class of defendants subject to the death sentence, all that is constitutionally required at the sentencing phase is a consideration of mitigating factors. Lowenfield v. Phelps. The jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense in order that the punishment be directly related to the personal culpability of the defendant. Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). See also Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Here, the instruction did not prohibit the jury from considering whatever motivation appellant may have had for hiring someone to kill her husband or from considering any evidence offered or argued in mitigation in arriving at its advisory verdict.

IX.
Appellant contends that the trial court erroneously submitted, for the jury's consideration, the statutory aggravating circumstance that the crimes were especially heinous, atrocious, or cruel, § 13A-5-49(8), because, she says, the evidence was insufficient. She argues that the jury's advisory sentence was tainted by its consideration of this statutory aggravating circumstance.
The trial court instructed the jury as follows:
"Now the final aggravating circumstance is number 8, that you need to consider. Number 8 is the capital offense was especially heinous, atrocious or cruel as compared to the other capital offenses. Now this circumstance has not been proved as a matter of law and therefore it is for you to determine from the evidence in the trial in chief and the testimony in this sentence hearing as to whether or not the State has proved this circumstance to you beyond a reasonable doubt and to a moral certainty. In regard to this circumstance, I give you the following instructions.
"The word `heinous' means extremely wicked or shockingly evil. The term `atrocious' means outrageously wicked and vile. The term, `cruel' means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of the suffering of others.
"What is intended to be included in this aggravating circumstance is those cases where the actual commission of a capital offense is accompanied by such additional acts as to set the crime apart from the norm of capital offenses.
"For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be [a] conscienceless *386 or pitiless crime which is unnecessarily torturous to the victim. All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness or atrociousness or cruelty exceeds that which [normally] exist when a capital offense is committed."
These instructions were proper and furnished adequate guidance to the jury. The court's instructions that this aggravating circumstance should apply to the conscienceless or pitiless crime which is unnecessarily tortuous to the victim and one in which the brutality exceeds that which is normally present in any capital offense met the requirements of law. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Ex parte Kyzer, 399 So.2d 330 (Ala.1981); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala. 1989), cert, denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
Appellant argues that there was no evidence that Henderson, the triggerman, intended the death to be torturous. We find no merit to this argument. Caselaw supports an emphasis, in determining the presence of that circumstance, on the actual pain and fear experienced by the victim and not on the defendant's actual intent that pain and fear occur. See, e.g., Hallford v. State, and cases cited therein.[3]
Appellant further argues that, even if this aggravating circumstance could be applied to Henderson, it should not have been submitted to the jury in her case, because, she says, there is no evidence that she wanted her husband's killing to be heinous, atrocious, or cruel. We consider this issue to have been resolved adversely to appellant's contention by the Alabama Supreme Court in Ex parte Bankhead. The evidence, in the instant case, was such that the aggravating circumstance was properly submitted to the jury and, further, that the jury could reasonably have found beyond a reasonable doubt that the circumstance existed. This was a murder, precipitated by contract for hire and facilitating robbery, that was particularly brutal and atrocious. Appellant intended that her husband be killed, and she willfully, maliciously, and intentionally set in motion the plan whereby her husband met a heinous, atrocious, and cruel death.
The application of this aggravating circumstance to appellant is justified even though she was not present when the killing occurred. See State v. Groseclose, 615 S.W.2d 142 (Tenn.1981), cert, denied, 454 U.S. 882, 102 S.Ct. 366, 367, 70 L.Ed.2d 193 (1981). In Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), the Court held that the death penalty is unconstitutional for one who "does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." In Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Court held that it was not cruel and unusual punishment to impose the death penalty upon a defendant who played a significant role in the felony that resulted in murder and who acted with reckless indifference to human life. The rule that has evolved from Enmund and Tison is that the death sentence is disproportionate under the Eighth Amendment for the non-triggerman who was not present at the scene and did not intend that anyone be killed; however, it is permissible under the Eighth Amendment for felony murderers who actually killed, attempted to kill, or intended that a killing take place or that lethal force be used. In White v. Wainwright, 809 F.2d 1478, 1484 (11th Cir. 1987), in holding that the death penalty may be imposed for conviction of a joint robbery undertaking where the defendant contemplated that lethal force would be used, even though he claims personal opposition to the use of lethal force, the court stated:
"In Ross v. Kemp, 756 F.2d 1483 (11th Cir. 1985) (en banc) we considered the possibility that appellant was a non-shooter *387 and that the fatal shot was fired by his accomplice. We declined to read Enmund in a mechanistic fashion but merely `as requiring a level of individual participation that justifies the application of the death penalty,' id. at 1489, and we concluded that the primary purposes of capital punishment, deterrence and retribution, legitimately could be applied to the facts of the case. Id. We found, in the language of Enmund, that the defendant's `intentions, expectations and actions' rose to a level of culpability that the retributive purposes of capital punishment would be furthered by defendant's sentence. Id. And, in reaching these holdings, we considered not only the contemplation of lethal force but also the active participation by the defendant in the activities that culminated in the victim's death. Id."
Applying the Enmund test to the instant case, we find that appellant was sufficiently involved in the killing to constitutionally authorize the application of the death penalty to her, even though she was an accomplice non-triggerman.
Appellant further contends that the trial court failed to provide the jury with the opportunity to compare the instant capital offenses with other capital offenses. This argument has recently been decided adversely to appellant in Ex parte Bankhead.
Finally, we hold that the court's failure to find the existence of this aggravating circumstance does not support appellant's argument that the court erred in instructing the jury that it could consider whether the circumstance had been proven by the state beyond a reasonable doubt. See Henderson v. State, 583 So.2d 276. As previously stated, the issue was properly submitted to the jury. That the trial court, the ultimate sentencing authority, failed to find the aggravating circumstance was not injurious to appellant.
We find no merit to the appellant's contentions raised under paragraph IX of her brief.

X.
Appellant further contends that the trial court's jury instructions concerning the "especially heinous, atrocious, and cruel" statutory aggravating circumstance violated the Eighth Amendment because, she says, they were too vague to adequately guide the jury. She relies on Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The instant case is distinguishable from Maynard. Unlike Maynard, the jury here was instructed on the meaning of the words of the aggravating circumstance in the context of capital sentencing. These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), wherein the court stated: "The aggravating circumstance listed in § 13-1-6(8) [now § 13A-5-49(8) ] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." For other cases in which we applied the rule established in Ex parte Kyzer, see Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert, denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala. 1989). See also Ex parte Bankhead; Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.), cert, denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
We find that the instant instructions in reference to this aggravating circumstance were proper and were sufficient to guide the jury's discretion in deciding whether to recommend the death penalty. The instructions limiting the jury's consideration of the aggravating circumstance supplied the deficiencies found by the Maynard Court in reviewing the Oklahoma procedures.

XI.
Appellant next contends that "[t]he jury's general verdict recommending the death penalty violated the Eighth *388 Amendment prohibition against the arbitrary infliction of capital punishment because it is impossible to determine whether the jury found one or more of the statutory aggravating circumstances that were a prerequisite to the imposition of a death sentence."
The jury was properly instructed that it was required to find at least one statutory aggravating circumstance before it could recommend a death sentence. As previously noted, the trial court instructed the jury that two aggravating circumstances had been proven by virtue of the jury's findings that appellant was guilty of the capital offenses of robbery-murder and murder for hire. The court also instructed the jury that it could consider whether the state had proven the aggravating circumstance that the capital offense was committed in a heinous, atrocious, or cruel manner as compared to other capital offenses.
We have previously addressed this issue and concluded that there is no statutory or constitutional requirement that the jury make specific findings of aggravating or mitigating circumstances during the sentencing phase of a capital case under Alabama's capital offense statute.
"This court in Bush v. State, 431 So.2d 555 (Ala.Cr.App.1982), aff'd, 431 So.2d 563 (Ala.), cert, denied, Bush v. Alabama, 464 U.S. 865 [104 S.Ct. 200, 78 L.Ed.2d 175] ... (1983), stated that `any such contention that the jury should make specific findings enumerating the aggravating circumstances it found to exist was foreclosed by Proffitt v. Florida, 428 U.S. 242 [96 S.Ct. 2960, 49 L.Ed.2d 913] ... (1976).' In Proffitt, the United States Supreme Court stated that `since ... the trial judge must justify the imposition of a death sentence with written findings, meaningful appellate review of each such sentence is made possible.' 428 U.S. at 250 [96 S.Ct. at 2965].... Because the trial court was required to and did set forth in writing findings of fact as a basis for the sentence of death, as required by Code of Alabama, § 13-11-4 [now § 13A-5-47], we find that appellant can be afforded meaningful appellate review in accordance with the rule in Proffitt and Bush."[4]
Morrison v. State, 500 So.2d 36, 42 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987). See also Ex parte Clisby, 456 So.2d 105 (Ala.1984).
In the instant case, the trial court set forth, in writing, findings of fact as the basis for the sentence of death, as required by § 13A-5-47. From this, appellant can be afforded meaningful appellate review. See Proffitt v. Florida; Bush v. State.

XII.
Appellant contends that the trial court failed to consider her evidence of non-statutory mitigating circumstances. The trial court's sentencing order pertaining to its consideration of non-statutory mitigating circumstances is as follows:
"The Court has made a diligent search under the provisions of section 13A-5-52, the evidence offered by the defendant, and aspects of presentence report favorable to the defendant on mitigation to determine if there is any aspect of the defendant's character on [sic] record or any circumstances of the offenses for which she has been convicted that would constitute a mitigating circumstance and finds that the only mitigating circumstance, statutory or non-statutory, is the absence of a prior criminal record."
Section 13A-5-52, referred to in the court's order, reads as follows:
"In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include *389 any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death."
A capital sentencer may not refuse to consider or be "precluded from considering" mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding his character or record and any of the circumstances of the offense, and consideration of such evidence is a constitutionally indispensible part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
In the instant case, appellant was afforded a full and unrestricted opportunity to present mitigating evidence regarding her character, background, motivations, and record and the circumstances of the offense. The order of the trial court clearly shows that it considered all relevant statutory and non-statutory mitigating evidence. We find no merit to appellant's contention that the trial court failed to consider her evidence of non-statutory mitigating circumstances. It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sentencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), aff'd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala. 1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), aff'd, 500 So.2d 1064 (Ala. 1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
Appellant particularly takes issue with the trial court's failure to find that her alleged suffering from "spouse abuse syndrome" constituted a mitigating circumstance, which she argues the court should have weighed in sentencing. The fact that the court did not make such a finding does not mean that it did not consider the evidence offered. On the contrary, it indicates that the trial court did not find that the evidence was mitigating. We find no abuse of the trial court's discretion in this regard.

XIII.
Appellant contends that her constitutional rights were denied by the trial court's jury instruction that the jury should recommend a sentence of death if it found that the aggravating circumstances outweighed the mitigating circumstances. The trial court instructed the jury as follows:
"If after a fair and full consideration of all the evidence in the case you are convinced beyond a reasonable doubt and to a moral certainty that at least one of the aggravating circumstances exist, and as I mentioned to you, two aggravating circumstances have been proven as a matter of law by your verdict in this guilt stage, and you are convinced that the aggravating circumstances outweigh the mitigating circumstances, your verdict would be, and I have verdict forms prepared for your consideration, the verdict form would be:
"WE, THE JURY, RECOMMEND THAT THE DEFENDANT, JUDY M. HANEY, BE PUNISHED BY DEATH."
The above instruction follows § 13A-5-46(e)(3), which reads:
"If the jury determines that one or more aggravating circumstances as defined in section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death." *390 However, appellant argues that the jury instruction violated the Eighth Amendment because, she says, the jury was not permitted to make a reasoned moral judgment about the appropriate sentence.
The United States Supreme Court recently addressed this issue in Blystone v. Pennsylvania, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990). In Blystone, the jury found that no mitigating circumstances existed and sentenced the defendant to death pursuant to the Pennsylvania death penalty statute, which provides that "[t]he verdict must be a sentence of death if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances," 42 Pa.Cons.Stat. § 9711(c)(1)(IV). The Pennsylvania and Alabama statutes in this regard are almost identical. Blystone contended on appeal that the Pennsylvania death penalty statute was unconstitutional because it mandated a death sentence based on the outcome of the weighing process. In rejecting this contention, the Court stated the following:
"Petitioner contends that the mandatory imposition of death in this situation violates the Eighth Amendment requirement of individualized sentencing since the jury was precluded from considering whether the severity of his aggravating circumstance warranted the death sentence. We reject this argument. The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants, and the Eighth Amendment does not require that these aggravating circumstances be further refined or weighed by a jury. See Lowenfield v. Phelps, 484 U.S. 231, 244, [108 S.Ct. 546, 554, 98 L.Ed.2d 568] ... (1988) (The use of "aggravating circumstances" is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion'). The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence. In petitioner's case the jury was specifically instructed to consider, as mitigating evidence, any `matter concerning the character or record of the defendant, or the circumstances of his offense.' App. 12-13. This was sufficient to satisfy the dictates of the Eighth Amendment."
Id. at 306-07, 110 S.Ct. at 1083-84 (footnote omitted).
In considering a similar provision in the California death penalty statute, CALJIC 8.84.2, where the defendant objected to the mandatory nature of the statute, the Court in Boyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 in reaffirming its holding in Blystone, stated the following:
"We need not discuss petitioner's claim at length, because we conclude that it is foreclosed by our decision earlier this Term in Blystone v. Pennsylvania, 494 U.S. 299, 110 S.Ct. 1078 [108 L.Ed.2d 255] ... (1990). In Blystone, we rejected a challenge to an instruction with similar mandatory language, holding that `[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.' Id., at 307, 110 S.Ct., at 1083. Although Blystone, unlike Boyde, did not present any mitigating evidence at the penalty phase of his capital trial, the legal principle we expounded in Blystone clearly requires rejection of Boyde's claim as well, because the mandatory language of CALJIC 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence. Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances `outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence `in an effort to achieve a more rational and equitable administration of the death penalty.' Franklin v. Lynaugh, 487 U.S. 164, 181 [108 S.Ct. 2320, 2330, 101 L.Ed.2d 155] ... (1988) (plurality opinion). Petitioner's claim that the `shall impose' language of CALJIC 8.84.2 *391 unconstitutionally prevents `individualized assessment' by the jury is thus without merit."
In the instant case, the jury was properly instructed to consider, as mitigating evidence, not only the statutory mitigating circumstances enunciated in § 13A-5-51, but "any aspect of the defendant's character or record and any of the circumstances of the offense." As in Blystone and Boyde, this was sufficient to satisfy the requirements of the Eighth and Fourteenth Amendments.
We also find no merit to appellant's contention that the jury was not instructed on its duty if it found the aggravating and mitigating circumstances to be evenly balanced. The jury instructions concerning the weighing process were proper, followed the statute, were clear and understandable, and could not have misled the jury as to its responsibility and function. See § 13A-5-46.
Appellant further contends that it was error for the trial court to instruct the jury as follows:
"Mitigating circumstances however considered by you should be based upon the evidence that you have heard in this case. The burden of disproving it by a preponderance of the evidence is on the State. You are to consider that mitigating circumstances of which evidence has been offered do exist unless taking the evidence as a whole, it is more likely than not that the mitigating circumstance does not exist.
"If the factual existence of an offer of a mitigating circumstance is in dispute, the State shall have the burden of disproving the factual existence of that circumstance by the preponderance of the evidence."
We do not agree. The instruction follows § 13A-5-45(g). We have held that "it is constitutionally permissible to place the burden of proving the mitigating circumstances on the defendant," Cochran v. State, 500 So.2d at 1172. Since the burden to prove mitigating circumstances could constitutionally be placed entirely on a defendant, this appellant is not justified in complaining about the statute which places a burden on the state to disprove evidence offered in mitigation when the factual existence of the mitigating evidence is in dispute.

XIV.
Appellant contends that her constitutional rights were violated by the trial court's failure to qualify prospective jurors as to whether they had a fixed opinion in favor of capital punishment. She complains that the trial court, on voir dire, questioned prospective jurors as to whether they were opposed to capital punishment, but did not question them as to whether they believed that persons found guilty of a capital offense should be sentenced to death. She relies on Bracewell v. State, 506 So.2d 354 (Ala.Cr.App.1986).
In the instant case, the prospective jurors were divided into four panels for voir dire purposes, and separate questions were addressed to each panel. Initially, the trial court briefly questioned each panel and then allowed counsel for the parties to conduct extensive and unlimited voir dire examinations. Among the questions propounded to each panel, by the trial court, was whether any venireperson had a fixed opinion against capital punishment or punishment in the penitentiary. The court asked the first panel, "Do any of you jurors have a fixed opinion against capital or penitentiary punishment to the extent that you would refuse to impose the death penalty regardless of the evidence produced and the Court's charge to the law?" To each of the next three panels, it asked, in substance, "Do any of you jurors have a fixed opinion against capital punishment to the extent that you would refuse to impose a death penalty regardless of the evidence produced and the Court's charge to the law? Do any of you have a fixed opinion against penitentiary punishment?"
One venireperson expressed a fixed opinion against capital punishment and was excused on challenge by the state. Defense counsel asked no questions of the venirepersons as to whether they were for or against capital punishment.
*392 Since no objection was raised to the voir dire proceedings below, in reference to the death qualifications of the venire, we review this issue under the "plain error" standard prescribed by A.R.App.P. 45A. This rule requires that we notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate action whenever such error has or probably has adversely affected the substantial rights of the appellant. The Alabama Supreme Court has adopted federal case law defining plain error, holding that "`[p]lain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)).
A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 420, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)) (emphasis added in Wainwright); Lawhorn v. State; Kuenzel v. State; Bracewell v. State. A jury composed exclusively of jurors who have been death-qualified in accordance with the Witt test is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). The Constitution does not prohibit the state from death qualifying juries in capital cases. Id.
While it is proper to exclude a prospective juror who is so opposed to the death penalty that he is prevented from performing, or substantially impaired in the performance of, his duties as a juror in accordance with his instructions and oath, it is also proper to exclude a prospective juror who believes that the death penalty should automatically be imposed in every capital case when there is a guilty verdict. Martin v. State, 548 So.2d 488 (Ala.Cr.App.1988), aff'd, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). See also Lawhorn v. State; Kuenzel v. State. The same principles are involved. "Upon proper request, a jury venire in a capital case should be questioned as to whether or not any venireperson has a fixed opinion in favor of capital punishment." Bracewell v. State, 506 So.2d at 358 (emphasis in original). However, in the absence of a specific request that the jury venire be examined to determine whether any member of the panel has a fixed opinion in favor of capital punishment, the failure of the trial court to conduct such examination does not constitute plain error. Kuenzel v. State. See also Lawhorn v. State; Henderson v. State, 583 So.2d 276.
Accordingly, since appellant made no request that the venire be qualified as to whether the members had a fixed opinion in favor of capital punishment, the failure of the trial court to do so does not constitute plain error. As we have pointed out, the trial court allowed the attorneys to conduct the bulk of the voir dire, without limitation or restriction. It was extensive and, on numerous occasions, the venirepersons were asked if they could, if selected to serve, base their decisions in the case entirely on the evidence presented and in accordance with the court's instructions. All indicated that they could do so, with the exception of the one venireperson challenged and excused. It should also be noted that all venirepersons indicated that they were not opposed to penitentiary punishment. We conclude, after reviewing the entire jury selection process and, particularly, that portion dealing with the death qualification of the prospective jurors, that there was no plain error or defect in the proceedings.
Appellant also charges in her brief that "[t]he jury selection process in this case was designed to produce a jury that was biased in favor of the death penalty." She *393 implies that the trial court directed the voir dire for this purpose and limited counsel in their voir dire questioning. We do not agree with appellant's accusations. We find nothing in the record to support her charges. The trial court's questions cannot be interpreted in the manner suggested by appellant, and counsel were permitted unlimited opportunity to propound voir dire questions to the venire and did so. The only reasonable conclusion to be drawn from the record is that a conscious effort was made by the trial court and all parties to select a qualified and unbiased jury to try the case.

XV.
Appellant next contends that the prosecutor made improper remarks to the jury during voir dire questioning in the jury selection phase of the trial and during closing argument in the jury sentencing phase. She argues that these remarks "infected the punishment phase of the trial with fundamental unfairness, ... and undermined the reliability of the jury's recommendation of the death penalty." She further argues that the comments violated her Eighth Amendment right to an individualized determination of the appropriate penalty for her capital convictions because they urged the jury to ignore the mitigating evidence that she presented.
The remarks complained of, which were made during the selection of the jury, are in the form of voir dire questions to the venire, and are as follows:
"The only thing that I ever ask you and the State of Alabama asks you and the Haney family asks you, is will you sit as a juror and listen to the evidence that comes to you from the witness stand, use the facts that the Judge will give you and decide who is telling the truth and what the true facts are. Then you take those facts and apply them to the law that the Judge gives you and render a true verdict thereon, not some collateral matter, not some sympathy, not some bias, or anything else, but just in your heart and in your mind what is the evidence from the witness stand and the Judge's charges as to the law. Is there anyone of you that can't do that?
"....
"I think the Judge will charge you that if you are selected as a juror that the only thing that you should consider would be the evidence which comes to you from the witness stand and the Judge's charges as to the law. You are not to consider anything that you have read or heard about it, not anything that would be speculative or conjecture, and certainly not any sympathy, bias, or anything like that. Is there any one of you that don't think that you could put all of those things out of your mind and render a verdict based strictly upon the law that the Judge gives you and the evidence that comes to you from under oath?"
Appellant argues that the prosecutor's remarks telling the prospective jurors that they should not consider "sympathy" in their deliberations if they were selected to serve on the jury had the effect of urging the prospective jurors to ignore the mitigating evidence of spouse and child abuse which she presented. We do not view these questions by the prosecutor to be improper. We view the use of the word "sympathy" in the remarks to be unrelated to the evidence in the case. The question containing the word "sympathy" is nothing more than asking the venirepersons whether they could base their decision only on the evidence presented at trial and the court's instructions as to the law.
An analogous situation arose in California v. Brown, 479 U.S. 538, 539, 107 S.Ct. 837, 838, 93 L.Ed.2d 934 (1987), where the question presented for review was "whether an instruction informing jurors that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial violated the Eighth and Fourteenth Amendments." In holding that the instruction did not violate the Constitution, the Court found that the instruction was nothing more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death *394 penalty and that it was meant to confine the jury's deliberations to considerations arising from the evidence presented. The Court held that the jury instruction that the juror must not be swayed by mere sympathy or by public sentiment did not violate the Eighth and Fourteenth Amendment requirement that the sentencer be allowed to consider any relevant mitigating evidence about the crime or the defendant.
The voir dire remarks here, of course, do not rise to the level of jury instructions during the sentencing phase, as was the case in California v. Brown. Here, however, like the Brown Court, we find the remarks to be no more than a catalog of factors which could improperly influence a jury's decision.
The remarks complained of during closing argument in the jury sentencing phase are as follows:
"I submit that under all of the evidence and the law in this casewhen you look at the aggravating circumstances and you weigh them against the mitigating circumstances I've talked about, then the verdict in this case, the just verdict in this case is for her to have justice under the law and to have death in this case based on everything. You've got to put aside some sympathy for the children. I hate it for the children and I can't get away from that. But let me tell you something. The children didn't commit this crime. That woman committed the crime and today is the day that she has got to bear some of the burden that she has tried to hide behind these children, hide behind parents.
"....
"When you come into that rail right there, I like to refer to it as one thing, as human beings we have the right to have as citizens of this countryall the weaknesses, all the sympathies that we as human beings are entitled to, and that's what they are playing to. When you walk into that rail, I like to refer to it as this. You shed yourself of those normal things that you are entitled to have. Sympathies, weaknesses, everything normal that you could have. When you walk in through that rail, as soon as you walk in, you are the sole imposers of the law in this community. You have to shed those things and you have to do what is right under the facts and under the law. You are in fact the conscience of this community, you and nobody in this case. You are the ones who have to make the decision. I don't have any question that you won't do what you think is right. And you are not going with that sympathy, and you are not going to let any plea decide and take the place of what the facts are. I submit this [...] that law without enforcement becomes laws no more."
Our examination of the portion of the closing argument set out above leads us to the conclusion that it is no more than the prosecutor urging the jury not to be distracted by matters unrelated to the evidence, but to confine itself to the facts and the law. See California v. Brown. The prosecutor's remarks concerning sympathy, sympathy for children, and weaknesses are obvious efforts to prevent the jurors from considering emotional responses not based on the evidence, and they are permitted by Brown.
The anti-sympathy instruction was recently addressed again by the United States Supreme Court in Saffle v. Parks, 494 U.S. 484, 492-94, 110 S.Ct. 1257, 1262-63, 108 L.Ed.2d 415 (1990), as follows:
"It is no doubt constitutionally permissible, if not constitutionally required, see Gregg v. Georgia, 428 U.S. 153, 189-95 [96 S.Ct. 2909, 2932-35, 49 L.Ed.2d 859]... (1976) (opinion of Stewart, Powell, and STEVENS, JJ.), for the State to insist that `the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.' California v. Brown, 479 U.S., at 545 [107 S.Ct., at 841]... (O'CONNOR, J., concurring). Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It *395 would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our long-standing recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary....
"....
".... In Brown, we held that an instruction telling the jury not to be `swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling,"' during the sentencing phase did not violate the Eighth Amendment. See id., at 542 [107 S.Ct. at 840],.... We reasoned that a reasonable juror would interpret the instruction to ignore mere sympathy `as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence,' and that it was not unconstitutional for a State to `prohibi[t] juries from basing their sentencing decisions on factors not presented at trial.' Id., at 542-543 [107 S.Ct. at 840],.... Although we approved of the use of the antisympathy instruction given in Brown, Parks attempts to transform our reasoning in that case into a rule that the instruction given in his case violates the Eighth Amendment.
"Parks' argument relies upon a negative inference: because we concluded in Brown that it was permissible under the Constitution to prevent the jury from considering emotions not based upon the evidence, it follows that the Constitution requires that the jury be allowed to consider and give effect to emotions that are based upon mitigating evidence. For the reasons discussed above, see supra, [494 U.S.] at 488-91 [110 S.Ct. at 1260-62] we doubt that this inference follows from Brown or is consistent with our precedents. The same doubts are shared by the clear majority of federal and state courts that have passed upon the constitutionality of antisympathy instructions after Brown."

Based upon the holdings of California v. Brown and Saffle v. Parks, we find no error in the comments and questions of the prosecutor.
Appellant also objects to the following argument of the prosecutor during the jury sentencing phase:
"I'll tell you this, if there is one person who believes in capital punishment, it's that lady right over there. She decided when Jerry Haney was going to die. I'll tell you something else about capital punishment. I don't think there is any question about this. It is, as I refer to it, an ancient right of self defense. If, as citizens, we believe that a person has a right to kill somebody for coming into their house, to protect their children and family, then we must believe that society has that same right. Capital punishment is society's right of self defense."
She claims that these remarks were inflammatory and irrelevant to the question of a proper sentence. We find that this line of argument is within the latitude allowed prosecutors in their exhortations to the jury to discharge its duties in such a manner as to punish crime, protect the public, and deter others from committing like offenses. See Ex parte Waldrop, 459 So.2d 959 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1986); Embrey v. State, 283 Ala. 110, 214 So.2d 567 (1968).
Appellant's contention that the prosecuting attorney "improperly injected himself and vouched for the appropriateness of a death sentence" is without merit.
Likewise, appellant's contention that the prosecutor's closing argument viewed, as a whole, denied her a fundamentally fair trial and violated her Eighth Amendment rights is without merit.

XVI.
Appellant contends that the photographs of the deceased victim, and a small piece of human tissue recovered at the scene of the killing were erroneously admitted into evidence. She argues that the items were of no probative value and that their admission was unduly prejudicial, requiring reversal of the case. She, in effect, contends that the admission of the evidence denied her *396 the fundamental right to a fair trial. We do not agree.
"As a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Hopkins v. State, 429 So.2d 1146 (Ala.Crim.App.), cert. denied, 429 So.2d 1146 (Ala. [Crim.App.] 1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App.1983); Carpenter v. State, 400 So.2d 417 (Ala.Crim.App.), cert. denied, 400 So.2d 427 (Ala.1981). Photographs which depict the character and location of external wounds on the body of a deceased are admissible even though they are cumulative and based upon undisputed matters. Wicker v. State, 433 So.2d 1190 (Ala.Cr.App.1983); Hopkins v. State; Hines v. State, 365 So.2d 320 (Ala.Crim.App.), cert. denied, 365 So.2d 322 (Ala.1978). The fact that a photograph is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury. Warrick v. State, 460 So.2d 320 (Ala.Crim.App.1984); Carpenter v. State; Richards v. State, 337 So.2d 171 (Ala.Crim.App.), cert. denied, 337 So.2d 173 (Ala.1976)."
Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991).
We have examined the photographs admitted into evidence in this case and have considered their admission in accordance with the principles of Magwood v. State. We find that the trial court did not abuse its discretion in admitting the photographs into evidence. The photographs depict the location of the crimes, the manner in which it was carried out, and its viciousness, all of which were highly relevant to the issues in the case. Moreover, the photographs were relevant to corroborate or disprove other evidence in the case. They were probative in proving the aggravating circumstance that the crimes were committed in an especially heinous, atrocious, or cruel manner as compared to other capital offenses. See Ex parte Bankhead; § 13A-5-49(8).
We have examined the human tissue which was recovered from the crime scene shortly after the murder and ultimately admitted into evidence. It is reasonable to conclude that the tissue came from the victim, since the blood found in it was of the same type as the victim's. It is approximately three-fourths of an inch long and approximately one-eighth of an inch thick. It had dried on a leaf at the crime scene. The tissue came into evidence along with several other exhibits of a scientific nature. It was not singled out by the prosecution and given special attention. We are of the opinion that appellant was not prejudiced by the admission of the exhibit, and it had the same probative value as a photograph depicting the tissue at the scene. It was admissible to show the viciousness and cruelty of the assault and was relevant to the issues in the case. The trial court did not abuse its discretion in admitting the exhibit of human tissue into evidence.

XVII.
Appellant contends that she was denied due process of law by improper prosecutorial argument. She avers several instances of allegedly improper closing argument to the jury and, also, contends that the prosecutor's closing argument, considered as a whole, was constitutionally improper.
In reviewing allegedly improper prosecutorial argument, it first must be determined if the argument was, in fact, improper. If the argument is determined to be improper, the test, for review, is not whether the comments did influence the jury, but whether they might have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala.1986); Ex parte Beecher, 294 Ala. 674, 320 So.2d 727 (1975); Rutledge v. State, 523 So.2d *397 1087 (Ala.Cr.App.1987), rev'd and remanded on other grounds, 523 So.2d 1118 (Ala.1988).
Appellant first contends that the prosecutor, in his argument, shifted the burden of proof to appellant by arguing that a person is presumed to intend the natural and probable consequences of his actions, citing Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). The record shows the following:
"MR. KING [deputy prosecuting attorney]: I think Judge Fielding [the trial judge] will tell you that a person commits murder under the law of the State of Alabama, if with the intent to cause the death of another person, he causes or she causes the death of that person, or another person. So in that, you get down to intent. What is intent? I submit to you that intent is something that somebody has got up here. You've got to look to the entire picture. All the facts and circumstances in the case that go back to the start of this matter and leading up, I submit to you all the way till September 10th, when she was ultimately apprehended. But intent is a design. It is a purpose. It is a state of mind. Intent can be formed. It can be formed in a single second. I think the Judge will tell you that, but I submit to you that a person intends the natural and probable consequences of their action. Natural and probable consequences about hiring somebody to kill somebody is one thing.
"MR. BLAIR [defense counsel]: Your Honor, I would like to object [to] that portion of the closing statement in which it is stated that a person intends the natural and probable consequences of his actions. I had not been aware there would be a charge to that effect.
"MR. RUMSEY [prosecuting attorney]: Your Honor, he is telling what he expects the law to be in the charge.
"THE COURT: I overrule at this time.
"MR. KING: I also submit to you that I think that Judge Fielding will tell you that a person acts intentionally with respect to a conduct or to a result when his or her purpose is to act in that type of conduct or cause that type of result."
The trial court, without reference to any presumption, properly instructed the jury on the definition of intent under the law, "A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct." The trial court also told the jury, pursuant to a written requested charge, the following: "Intent is an indispensable element of the crime for which the defendant has been charged. I charge you that the State must prove intent beyond a reasonable doubt." See § 13A-2-2(1).
While the prosecutorial comment complained of is not a correct statement of the law, the subsequent instructions by the trial court were proper and met the requirements of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In the portion of the prosecutor's argument set out above, we note that the prosecutor correctly defined "intent" twice, once just before he made the objectionable statement and again just afterwards. We also note that Francis v. Franklin, which is relied upon by appellant, is distinguishable from the case at bar. Francis involved instructions to the jury by the trial court, and not a prosecutor's closing argumentnot an insubstantial difference. We have reviewed this comment in the light of the entire argument, along with the court's instructions to the jury, and, even though we find the comment to be erroneous, we conclude that a reasonable juror would not have been influenced or misled in any manner by the comment in reaching a verdict, especially in light of the overwhelming evidence of appellant's intent.
Appellant also contends that the prosecutor's comments in reference to the failure of the defense to produce certain medical records was improper. We do not agree. This portion of the argument constituted a legitimate comment on the evidence.
*398 Appellant next contends as follows: "The prosecutor improperly referred to facts outside the record and misstated the law. He argued that Martha Henderson was involved in a conspiracy to commit murder in the State of Georgia, but she did not commit a crime in Alabama." She argues that the prosecutor informed the jury that he was going to ask the Georgia authorities not to prosecute Martha Henderson for conspiracy because she helped the prosecution and predicted that she would not be prosecuted in Georgia after he made this recommendation. The state contends that these remarks, when placed in context, are not improper, but were replies to arguments made by defense counsel. We find that appellant's summary of the portion of the argument objected to is not entirely correct. Our review of the comments, in conjunction with the entire argument and the evidence in the case, leads us to the conclusion that the comments were not improper. We agree with the state that they were legitimate replies to arguments by the defense and, in some cases, reasonable inferences drawn from the evidence.
Appellant contends that a review of the prosecutor's closing argument, in its entirety, mandates a reversal because of the cumulative effect of alleged numerous instances of improper remarks. We do not agree. We have reviewed the entire argument and find no reversible error.

XVIII.
Appellant contends that she was denied due process of law by the trial court's refusal to instruct the jury, in the guilt phase, that the jury could consider two lesser included offenses: universal malice or reckless murder, § 13A-6-2(a)(2), and criminally negligent homicide, § 13A-6-4(a). Appellant submitted written requested charges covering these two offenses, and after a charge conference, the trial court refused to instruct on them. The trial court did instruct the jury on the lesser included offense of intentional murder, as to Count I of the indictment, and on the lesser included offenses of intentional murder, robbery in the first degree, robbery in the third degree, and manslaughter as to Count II of the indictment. § 13A-6-2(a)(1); § 13A-8-41; § 13A-8-43; § 13A-6-3, respectively.
Section 13A-6-2(a)(2) provides the following:
"A person commits the crime of murder if ... [u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person...."
Section 13A-6-4(a) provides the following: "A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence."
Appellant argues that the court's failure to charge the jury on these two offenses violated the principles set out in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). In Beck, the Court recognized the risk of an unwarranted conviction that is created when a jury is deprived of the option of convicting the defendant of a lesser included offense. Id. at 637, 100 S.Ct. at 2389. However, in Spaziano v. Florida, 468 U.S. 447, 453, 104 S.Ct. 3154, 3158, 82 L.Ed.2d 340 (1984), the Court stated that "nothing in Beck requir[es] that the jury determine the guilt or innocence of lesser included offenses for which the defendant could not be convicted and adjudicated guilty." See Kennedy v. State, 472 So.2d 1092 (Ala.Cr.App.1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). A defendant is entitled to a charge on a lesser included offense if there is any reasonable theory from the evidence that would support the position. Ex parte Oliver, 518 So.2d 705, (Ala.) on remand, 518 So.2d 707 (Ala.1987); Chavers v. State, 361 So.2d 1106 (Ala.1978); Williams v. State, 474 So.2d 178 (Ala.Cr.App.1985); § 13A-1-9.
In the instant case, there is no evidence that would support a reasonable theory that appellant was guilty of universal malice or reckless murder within the meaning of § 13A-6-2(a)(2). There is no way that her conduct, as shown by the evidence, *399 could be brought within the reckless murder statute. Most obviously, her murderous intent was directed toward her husband and not to human life in general. The doctrine of universal malice, depraved heart murder, or reckless homicide manifesting extreme indifference to human life is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual. Ex parte Washington, 448 So.2d 404 (Ala. 1984); Napier v. State, 357 So.2d 1001 (Ala.Cr.App. 1977), rev'd on other grounds, 357 So.2d 1011 (Ala.1978). When considered with the evidence in its entirety, appellant's arguments that she "did not have a specific intent to kill her husband when she accepted Jerry Henderson's offer to kill him for a price" and that "[a] rational jury could have found that she acted recklessly with a depraved indifference to human life because she consciously disregarded the grave risk that Henderson would carry out their bargain" are not persuasive. We also find, to be incredulous, appellant's claim that "[a] rational jury could have found that she was criminally negligent because she was unaware of the grave risk to her husband's life that she created by accepting Henderson's offer, without intending for him to carry out the contract for murder."
A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence. A person acts with criminal negligence when he fails to perceive a substantial and unjustifiable risk that the result will occur. Woods v. State, 485 So.2d 1243 (Ala.Cr.App.1986); §§ 13A-2-2(4) and -6-4(a). There is obviously no evidence to support a reasonable theory of criminally negligent homicide. We also point out that, since the trial court charged the jury on manslaughter, an offense involving reckless conduct, as a lesser included offense of the capital offense of robbery-murder and the jury found appellant guilty of the capital offense, rejecting manslaughter, the failure to instruct on criminally negligent homicide was not reversible error. See Ex parte Jordan, 486 So.2d 485 (Ala.1986).
The refusal of the trial court to instruct the jury that universal malice or reckless murder and criminally negligent homicide were lesser included offenses of the capital crimes charged under the facts of the instant case was proper.

XIX.
Appellant contends that error occurred by the trial court's admission of a tape-recorded conversation between Jerry Wayne Henderson, the triggerman, and his wife, Martha Henderson. The state offered the tape in rebuttal of appellant's testimony that a person other than Jerry Wayne Henderson killed her husband. Appellant objected to the introduction of the conversation on the grounds of hearsay and violation of her rights under the Fourth, Fifth, and Sixth Amendments. The prosecutor argued, inter alia, that the taped conversation was admissible on the ground that it was made in furtherance of a conspiracy. The trial court admitted the conversation into evidence without comment. The tape was played to the jury. In the tape, Jerry Wayne Henderson implicated both himself and appellant in the capital crimes.
An accomplice's statement cannot be used against an accused unless the statement falls within the conspiracy exception to the hearsay rule. See Bright v. State, 485 So.2d 398 (Ala.Cr.App.1986). Where proof of a conspiracy exists, any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of the conspiracy and in furtherance of a plan or design, is admissible against the accused. Conley v. State, 354 So.2d 1172 (Ala.Cr.App.1977). Before such a statement is admissible against a defendant, the prosecution must present prima facie evidence sufficient to establish the existence of a conspiracy. Bynum v. State, 348 So.2d 804 (Ala.Cr.App.1976), cert. denied, 348 So.2d 828 (Ala. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978).
"In order that the fact of a conspiracy may be established, it need not be proved *400 by evidence of an express agreement or compact between the alleged conspirators, or by any direct evidence of any agreement or compact. It may be proved inferentially, or by circumstantial evidence. Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony, which renders it peculiarly necessary and proper to permit them to be inferred from the circumstances." (Citations omitted.)
354 So.2d at 1177. "If the evidence warrants a finding of accused's participation in a conspiracy to suppress or fabricate evidence of the crime after its commission, an act or statement of a co-conspirator in the accomplishment of this continuing conspiracy is admissible against the accused." C. Gamble, McElroy's Alabama Evidence, § 195.03(5) (3d ed. 1977). If a co-conspirator is acting in concert to suppress evidence and the statement was made in furtherance of the defendants' efforts to do so, it is admissible whether the trial is a conspiracy trial or not. Latham v. State, 56 Ala.App. 234, 320 So.2d 747, cert. denied, 294 Ala. 685, 320 So.2d 760 (1975).
We find from the evidence in this case that a prima facie case of conspiracy was established. We find that, at the time Jerry Wayne Henderson made the statements to Martha Henderson, the conspiracy was on-going and had been for over three years or since the murder. The evidence shows that appellant and Jerry Wayne Henderson had been engaged, since the murder, in suppressing evidence of the crimes, in maintaining their alibis, and in avoiding detection. The statements of Jerry Wayne Henderson, in the taped conversation, were in furtherance of this continuing conspiracy, and thus, were admissible against appellant.
Appellant further contends that the court erroneously "failed to instruct the jury that the State had the burden of proving a conspiracy beyond a reasonable doubt before it could hold appellant vicariously liable for the acts and statements of her alleged conspirator, Jerry Wayne Henderson." We find no merit to this contention.
The trial court instructed the jury on the law of complicity, and immediately thereafter instructed on the presumption of innocence and reasonable doubt. Thereafter, the court reinstructed on complicity. Appellant objected to the jury being instructed a second time on complicity, but not on the ground now asserted. (Appellant contended that only a part of the complicity statute should have been reread to the jury.) We find no error in the charge or the supplemental charge concerning the law of complicity. The instructions could not have misled the jury into believing that it could find appellant guilty on evidence that did not satisfy the reasonable doubt standard.
Appellant also contends that the evidence was insufficient to corroborate the testimony of Martha Henderson and that it was error for the trial court to fail to instruct the jury on the effect of accomplice testimony. This issue is raised for the first time on appeal. Contrary to the assertions of appellant, we find from the evidence that Martha Henderson was not an accomplice to the commission of the capital offenses charged in the indictment. We find no merit in this contention.

XX.
Appellant contends that there was a violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), which requires that the prosecution disclose any "deal" it has with any witness.
Appellant argues that the prosecution made a deal with Martha Henderson in exchange for her testimony. This argument stems from comments made by the prosecutor in closing argument concerning Martha Henderson's cooperation. We do not read the comments to mean that Martha Henderson had been promised a reward or that she was going to be recommended for one or that she had been promised immunity from prosecution or that such was going to be recommended, as appellant implies. Certainly no "deal" can be ascertained or implied from the prosecutor's *401 comments. After reviewing the record, we can find no evidence that Martha Henderson testified pursuant to a deal with the state.

XXI.
In section XXI of appellant's brief, she commences by reminding us of our well-established responsibility to search the record for plain error in capital cases, in accordance with A.R.App.P. 45A. We, of course, have done this. She then states that she has "decided not to discuss numerous non-frivolous claims of federal constitutional error in the brief, with the expectation that these claims will be decided and preserved for federal review under the plain error rule." She further states that she expects us to review, under the plain error rule, all "adverse rulings" listed in an appendix to the brief along with all rulings in the case regardless of whether objections were made to them during trial. Listed in the appendix, which is required by the appellate rule pertaining to briefs, are approximately 150 adverse rulings. She also asks us to consider the cumulative effect of these adverse rulings. She then lists 16 "areas of the record" or claims to which she calls our attention and states that she expects us to review these "areas" under the plain error doctrine. Finally, she states that she is not raising an issue regarding ineffective assistance of trial counsel at this time, but reserves the right to do so in post-conviction proceedings. Appellant has also filed a supplemental brief addressing the 16 claims or areas referred to above.
We, at first, considered requiring appellate counsel to file a second supplemental brief to specifically address all alleged non-frivolous claims of federal constitutional error which were not briefed but are left for us to find and to decide under the plain error rule. However, after searching the entire record for plain error, with particular attention to the matters raised by appellant in this portion of her briefthe 16 "areas of the record" listed, the items listed in the appendix, the matter of ineffective assistance of trial counsel, and all other rulings of the trial courtand finding no plain error (except the trial court's possible consideration of the victim impact statement, discussed in part IV), we decided that a supplemental brief covering these alleged "non-frivolous" matters would only delay disposition of this appeal. We believe that appellant's briefs adequately cover all issues that should and could have been raised, in good faith, on appeal, particularly since we are not inclined to view, as serious, appellant's claim that there are "numerous non-frivolous claims of federal constitutional error" which she made no attempt to identify and brief. We suspect that the motive of appellant, in raising these matters in this manner, is to lay the groundwork to avoid the possibility of being procedurally barred from raising certain issues in future habeas corpus proceedings in federal court. This activity smacks of "sandbagging," which has been strongly condemned by the Supreme Court in Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In Julius v. Johnson, 840 F.2d 1533, 1546 (11th Cir.), modified on rehearing, 854 F.2d 400, cert. denied, 488 U.S. 960, 109 S.Ct. 404, 102 L.Ed.2d 392 (1988), the court stated:
"Since Magwood [v. Smith, 791 F.2d 1438 (11th Cir.1986),] was silent about the non-effect of Alabama's plain error rule on procedural default issues, we will be explicit: the mere existence of a `plain error' rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below.10 Unless there is some indication that the state court was aware of this issue, we cannot say that the court rejected the merits of petitioner's constitutional claim. A contrary rule would encourage the `sandbagging' of state courts criticized in Wainwright v. Sykes, 433 U.S. 72 [97 S.Ct. 2497, 53 L.Ed.2d 594] ... (1977). See Murray v. Carrier, 477 U.S. 478 [106 S.Ct. 2639, 91 L.Ed.2d 397] ... (1986) (possibility of `sandbagging' exists on appeal `since appellate counsel might well conclude that the best strategy is to *402 select a few promising claims for airing on appeal, while reserving others for federal habeas corpus review should the appeal be unsuccessful').
"10 This rule is limited to the facts of this case. We express no opinion as to the effect of such a statement when the allegedly barred issue was raised by the defendant but not discussed in the state court's opinion. Nor need we decide whether such language permits federal review where the defendant raised the claim at trial, thus making it more likely that the state appellate court came across the claim during its review of the record."
See also Reid v. Warden, Central Prison, 708 F.Supp. 730 (W.D.N.C.1989).
We will now address the 16 claims set out in paragraph XXI of appellant's brief and discussed in her supplemental brief. While most of the claims are obviously frivolous and ordinarily would require no discussion, we have decided to address all of them because of the nature of this case.

1.
Appellant contends that the trial court erred in requiring defense counsel, on motion of the state, to disclose prior, to trial and to the prosecutor the findings of a privately retained mental health expert the defense anticipated calling as an expert witness to support appellant's plea of not guilty because of mental disease or defect. The mental health expert subsequently testified for the defense. No objection was made to the court's order to produce the findings or report of the expert. We find no plain error in this ruling. The trial court is required to order the production of such evidence upon proper motion by the state. A.R.Cr.P.Temp. 18.2(c).

2.
Appellant contends that the failure to record the striking of the jury violated her constitutional rights. She refers to a pre-trial motion asking the court to order that all proceedings of the trial be recorded. The motion does not specifically refer to the striking of the jury; however, the record fails to show that this motion was ever ruled upon.
The record contains an extensive voir dire of the jury venire by the trial court, the prosecutor, and the appellant's counsel wherein each venireperson was identified and questioned. The minutes of the court recite that the jury was selected, impaneled, and sworn according to law. A strike list containing the names of all venirepersons, showing those selected to serve and those struck by the parties, is in the record. The record appears to be complete. We find no plain error in this contention.

3.
Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr.App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1988). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984). We have reviewed the record of the voir dire examinations and the entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury.

4.
Appellant next contends that the trial court erred by "minimizing" the importance of the penalty phase of the trial. She argues that this occurred when the trial court suggested to the jury that the sentencing phase would be brief. The trial court, after the guilt phase and prior to the sentencing phase, stated: "Ladies and gentlemen, at this point in time we will have to have another hearing. It won't take a very long time, I don't suppose. It all depends *403 on some factors." No objection was made to the comment by the court. Subsequent to the remarks, the appellant was allowed all the time she wished to present evidence at the sentencing hearing. There were no limitations or restrictions placed upon her in any manner. Reading this statement in the context of the proceedings, we fail to see how it could have affected the sentencing proceedings in any manner. We find no plain error in this contention.

5.
Appellant contends that the trial court improperly curtailed defense counsel's argument to the jury during the guilt phase of the trial. We note three instances during such argument where objections were made by the prosecutor and sustained. The comments objected to were: (1) Comment on the punishment for the crimes charged; (2) asking the jury to put themselves in the place of the defendant; and (3) discussing an alleged method with which guilt of a person was determined in China. Clearly the rulings of the trial court sustaining the prosecutor's objections in these instances were not improper. We find no error in these rulings.

6.
Appellant next contends that error occurred when the trial court allowed the prosecutor to make a rebuttal opening statement over objection of defendant at the beginning of the trial. This is a matter within the discretion of the trial court. 75 Am.Jur.2d, Trial § 202-3 (1974); 88 C.J.S. Trial § 43 (1955). See also A.R.Crim.P. (effective January 1, 1991). (The district attorney may be permitted a brief statement in rebuttal to the defendant's opening statement, in the court's discretion.) We have reviewed the opening statements of the prosecutor and find nothing in them prejudicial to appellant. We find no abuse of discretion here.

7.
Appellant contends that the trial court erred in permitting a non-expert witness to testify as to the cause of death of the victim. The witness was a medical examiner with the Alabama Department of Forensic Sciences and had a degree in mortuary science. He had assisted in conducting approximately 1800 autopsies or post-mortem examinations, including that of the victim in the instant case, during his 9 years with the department. The trial court permitted him to testify as an expert as to the cause of death and give descriptions of the wounds of the victim in the instant case. In our opinion, he was fully qualified as an expert to testify about the cause of death and give other medical testimony concerning the victim in this case. The trial court did not err in permitting him to so testify. In addition, a state pathologist whose qualifications were stipulated by appellant also testified as to the cause of death of the victim.

8.
Appellant contends that the trial court erred by allowing "numerous" hearsay statements into evidence against appellant. Appellant apparently is referring to the taped statement between her sister Martha Henderson and her co-defendant Jerry Henderson which was introduced into evidence during the state's rebuttal. We have previously addressed that issue in this opinion and have held that the statement was admissible.

9.
Appellant contends that the trial court erred by denying her an opportunity to cross-examine witnesses about her co-defendant's prior acts of violence. Appellant refers to a question asked of Michael Wayne Wright, a friend of co-defendant Jerry Wayne Henderson. He was asked if during the 15 years he had known Henderson, Henderson had exhibited any violence in his presence. The trial court properly sustained the prosecutor's objection to the question. It clearly sought information that was immaterial to any issues in the case.

10.
Appellant contends that the trial court erred in denying her an opportunity to cross-examine a state witness about prior abuse of appellant by the victim. She *404 specifically refers to a question asked investigator Dennis Surrett on cross-examination. The record shows the following:
"Q. [defense counsel]: During the course of your investigation, did you talk and did you find any information that would lead you to believe that Jerry Haney abused his family by beatings and abused his wife by beatings?
"MR. RUMSEY [prosecuting attorney]: Your Honor, we object to that. We covered that a while ago, Judge.
"THE COURT: I'm going to sustain at this time.
"MR. RUMSEY: I askhe just keeps on doing something that he knows is intentionally wrong, Your Honor.
"THE COURT: I think I instructed you to get permission from the Court to go into anything like that. I'm going to sustain at this point in time. It may be appropriate at some other time.
"MR. DENSON [defense counsel]: Judge, may we respectfully reserve exception?
"THE COURT: Yes, sir.
"MR. DENSON: On the ground that it denies us a thorough and sifting cross-examination?
"THE COURT: I understand.
"MR. DENSON: Judge, I believe that's all the questions at this time. I want to reserve the right to recall if it becomes necessary."
This matter first arose in the trial during the testimony of Martha Henderson, when defense counsel attempted to elicit information from her concerning possible abuse of appellant by the victim by asking questions which if answered would have been hearsay. The record in this regard shows the following:
"MR. RUMSEY [prosecuting attorney]: I want to make an oral Motion in Limine to what is obvious will be his tactic throughout the remainder of the trial, number one, as to what Judy told somebody.... [U]nder no stretch of the imagination is it a proper question when she said I've heard about it, what have you heard. There is just no rule, no exception under the law whatsoever that that can be admissible. What he is attempting to do is establish either a temporary type insanity under the diminished capacity or a battered wife syndrome to try to establish a self defense, which I submit to the Court they can't do it. He's trying to establish an insanity with hearsay evidence. He just can't do it....
"MR. DENSON [defense counsel]: I know you can't establish insanity with hearsay, Your Honor. I know that.
"MR. RUMSEY: You know very well that you can'tit's not a proper question, what have you heard about him beating her....
"....
"MR. DENSON: Of course, I think also that Mr. Rumsey will agree that hearsay is admissible if it is not objected to. I didn't know whether he was going to object to it or not. It is legal admissible evidence if it is not objected to.
"....
"MR. RUMSEY: Well, I'm making a Motion in Limine right now that he not be permitted to ask a question such as that without first obtaining permission outside the presence and hearing of the jury and further about asking the specific question, did Judy tell you? I'm not objecting to it with this witness, but any future witnesses, did Judy tell you that Jerry had beaten her or hit her or done anything
"MR. DENSON: I seriously doubt that will come up again, Your Honor.
"THE COURT: I'll just go ahead and enter an order and this way you will know to being it to my attention if you want to go into it. That will take care of that problem. It may very well be that you can go into it when we get down to it, depending on what the question is or who the witness is."
We find after reviewing the record that the ruling of the trial court sustaining the state's objection to the question was proper. The question attempted to elicit inadmissible hearsay. We note that the trial court in its ruling did not close the door completely to the type of evidence sought.
*405 We also note that appellant did not pursue the matter further in the trial, but did introduce substantial evidence of alleged abuse during the defense portion of the trial.

11.
Appellant contends that the trial court erred in giving the following instructions to the jury at the request of the state:
"There has been some evidence offered by the State for the purpose of showing that the defendant made a false, evasive or misleading statement to an investigating officer. Therefore, I want to tell you that intentionally false, contradictory, evasive, or misleading statements made by a defendant to an investigating officer may be introduced into evidence as showing the suspect's consciousness of guilt."
No objection was made to the giving of the charge.
Appellant argues that the trial court should have given a similar instruction to the jury in reference to Martha Henderson. In our opinion, the failure of the trial court to give such an instruction, sua sponte, did not constitute plain error.

12.
Appellant contends that the court erred by reinstructing the jury on the law of complicity. After instructing the jury during the guilt phase of the trial, the prosecutor objected to the portion of the charge relating to the law of complicity. He argued that the way the charge was given left the inference that the defendant had to be present when the crimes were committed in order to be found guilty under the complicity statute. The trial court agreed and, over the defendant's objection, reinstructed the jury on complicity. The new instruction was correct. We do not believe that the giving of the additional instruction put undue emphasis on complicity or prejudiced appellant in any manner. We find no error in the giving of this instruction.

13.
Appellant contends that prosecutorial misconduct occurred by the prosecuting attorney's injecting himself into the trial process by testifying about his presence at the scene of the crimes and vouching for the credibility of his key witness. She argues that this misconduct is shown by the questions asked witnesses by the prosecutor. We have examined the record in this regard and find nothing to support appellant's contention.

14.
Appellant contends that the trial court erred by allowing the prosecutor to argue his case during voir dire of the jury and to misstate the law. We have examined the voir dire and find no error.

15.
Appellant contends that "the trial court erred by allowing the jury to rely on an inapplicable aggravator and by itself basing Ms. Haney's sentence on that invalid aggravator." The aggravating circumstance she is referring to is that the murder was committed during a robbery. She contends that she could not be guilty of robbery because she was the wife of the victim and her husband's personal effects which were taken in the robbery were her property as well as his. She states:
"Appellant was, however, married to the victim and as a result of what he owned she owned as well. She could therefore not be guilty of robbing him. It would be as if she robbed herself and a conviction of robbery clearly can be sustained only upon proof that the property of another has been taken."
No authorities are cited to support this proposition.
A person commits the crime of robbery in the first degree if, in the course of committing a theft, he uses force against the person of the owner or any person present, with intent to overcome that person's physical resistance, and if he is armed with a deadly weapon or causes serious physical injury to another. Ala.Code §§ 13A-8-41, -43 (1975). For purposes of robbery, the "owner" is the person in possession of the property. Williams v. State, 546 So.2d 705 (Ala.Cr.App.1989). "A person may be a victim of robbery even though he is not the owner of the property; it is enough that he has possession and that *406 it is lawful as to the defendant, or that because of a legally recognized interest in the property he is entitled to possession as against the defendant." C. Torcia, Wharton's Criminal Law § 482 (14th ed. 1981). See also, Danzey v. State, 126 Ala. 15, 28 So. 697 (1900). "[T]o take one's own property is not robbery, for, as in larceny, the property must be another's, except in a case where the person from whom it is taken has a right to its possession, as well as actual possession." J. Miller, Handbook of Criminal Law § 124(a) (1934). Here, the victim clearly had possession as well as a right of possession of the items taken from him. The victim was entitled to the possession of the items as against appellant regardless of what interest she may have had in the property. Appellant could be found guilty of robbery of her husband under the facts of this case. We find no merit in her contention.
Appellant cannot prevail in this argument for another reason. She is prohibited by statute from asserting a claim of right to the property as a defense in a robbery prosecution. Section 13A-8-44, provides: "No person may submit in defense against a prosecution for robbery in any of its degrees that there was no theft because the taking was under a claim of right." She is precluded by this statute from raising this defense in this case.
Last, while we find it unnecessary to discuss the point, we note that she has completely ignored the effect that her guilt by complicity would have on her contention.

16.
Last, appellant contends that the trial court erred by instructing the jury on inapplicable aggravating factors. We have previously addressed this contention in this brief and found no merit in it.
In accordance with our responsibility under the plain error doctrine, as referred to above, we have meticulously reviewed the entire record of this cause and find no plain error in the guilt phase or in the jury sentencing phase. We pretermit further review until a return to remand in accordance with our findings and instructions in part IV above.
The trial court shall take all action directed in sufficient time to permit the circuit clerk to make a proper return to this court at the earliest possible time and within 30 days of the release of this opinion.
REMANDED WITH DIRECTIONS.
All Judges concur.

ON RETURN TO REMAND
PATTERSON, Presiding Judge.
This cause was remanded to the trial court with instructions to resentence the appellant without considering the victim impact statement, which was contained in the presentence report, and to issue new written findings. When initially reviewing the death sentence imposed by the trial court, it was unclear from the record whether the trial court had relied on the victim impact statement in determining the sentence. We found on initial review that the victim impact statement in the instant case was similar to the statement condemned in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and we concluded that, if, in fact, the statement was considered by the trial court in sentencing, it should not have been. Rather than relying on the presumption that a trial court disregards improper factors in sentencing, which the state urged us to do, we deemed it best, because this is a death penalty case, to remand the case for resentencing.
The trial court has complied with our remand and has filed a return in which the trial court again made specific written findings concerning the existence or nonexistence of aggravating and mitigating circumstances and written findings of fact summarizing the crimes and the appellant's participation in them, as required by § 13A-5-47(d), Code of Alabama 1975. The return also shows that the trial court considered the evidence presented during the guilt and sentence phases of the trial, weighed the aggravating and mitigating circumstances, as required by § 13A-5-47(e), considered the advisory verdict of the *407 jury, considered the presentence report without the victim impact statement, and, finding that the aggravating circumstances outweighed the mitigating circumstances, resentenced the appellant to death. As it turned out, the trial court was aware of the holding in Booth v. Maryland when it entered its first sentencing order and did not consider the victim impact statement at that time. The trial court's findings on remand contain the following statement:
"The Court has carefully read, studied and considered the Presentence Report, except as set out hereinafter, before arriving at the final decision determining the sentence herein. The Court was knowledgeable of the holding in Booth v. Maryland, 482 U.S. 496 [107 S.Ct. 2529, 96 L.Ed.2d 440] (1987), when it considered the punishment of the defendant, Judy Haney, and did not consider the victim impact statement as contained in said presentence report in sentencing the defendant on November 18, 1988. On remand, the Court resentences the defendant, Judy Haney, today as required by law without considering the victim impact statement as contained in the presentence report as previously mentioned."
It is apparent from the new sentencing order and findings of the trial court contained in the return to remand that there is no merit in the appellant's contention addressed in part IV of our original opinion that reversible error occurred in the sentencing phase of the trial because the trial court considered the victim impact statement, and we so hold.
As we stated in our original opinion, it is our responsibility to review the entire record in this case for plain error. A.R.App.P. 45A provides, as follows:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In accordance with the above rule, we have examined the record in the instant case, including the resentencing proceedings referred to above, for any plain error, whether or not the error was brought to our attention or to the attention of the trial court. In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error," adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). After reviewing the entire record, we find no plain error or defect in the proceedings, either in the guilt phase or the sentence phase of the trial.
We have also reviewed the appellant's sentence pursuant to § 13A-5-53. Section 13A-5-53(a) requires that, in addition to "reviewing the case for any error involving the conviction," we shall also review the propriety of the death sentence. This review is to include our determination of the following: (1) whether any error adversely affecting the rights of the defendant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine the following: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by us of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar *408 cases, considering both the crimes and the defendant.
After the appellant was convicted of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing the evidence pertaining to aggravating and mitigating circumstances and after being instructed by the trial court as to its responsibilities under the law, the jury, by a vote of 10 to 2 returned an advisory verdict of death.
The trial court then held another hearing in accordance with § 13A-5-47, to aid it in determining whether to sentence the appellant to death, as recommended by the jury, or to life imprisonment without the possibility of parole. As required by § 13A-5-47(b), the trial court ordered, reviewed, and considered a written presentence investigation report. Thereafter, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance listed in § 13A-5-49, and the existence or non-existence of any mitigating circumstance listed in § 13A-5-51 and S13A-5-52, as well as written findings of fact summarizing the crimes and the appellant's participation in them. The trial court found the existence of two aggravating circumstances, i.e., that the capital offenses were committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a robbery (§ 13A-5-49(4)) and that the capital offenses were committed for pecuniary gain (§ 13A-5-49(6)).
In accordance with §§ 13A-5-51 and -52, the trial court considered all evidence presented in all phases of the trial as well as aspects of the presentence report favorable to the appellant in its efforts to determine if there was any aspect of the appellant's character or record or any circumstances of the offenses for which she had been convicted that would constitute a mitigating circumstance. The court found the existence of one mitigating circumstance, i.e., that the defendant did not have a significant history of prior criminal activity (§ 13A-5-51(1)).
In deciding upon the sentence, the trial court considered the advisory verdict of the jury and weighed the aggravating circumstances and the mitigating circumstance. It found that the aggravating circumstances outweighed the mitigating circumstance, and it sentenced the appellant to death.[5]
The offenses for which the appellant was convicted, murder committed during a robbery in the first degree (§ 13A-5-40(a)(2)) and murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire (§ 13A-5-40(a)(7)), are capital offenses by statutory definition and designation. We take judicial notice that similar crimes are being punished capitally throughout the state. See, e.g., Ex parte Thomas, 460 So.2d 216, 225 (Ala.1984) (wherein the Court noted that two-thirds of the death sentences imposed in Alabama are in cases of robbery-murder); Hallford v. State, 548 So.2d 526 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989) (murder committed during the course of a robbery); Hallford v. State (same); Williams v. State, 461 So.2d 834 (Ala. Cr.App. 1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984) (murder for hire).
We have carefully searched the record of both the guilt and sentence phases of the trial and have found no reversible error. We find no error adversely affecting the rights of the appellant in the sentencing proceedings. In our review of the sentencing proceedings, we find that the trial court's findings and conclusions concerning the aggravating and mitigating circumstances are supported by the evidence. We find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We concur in the advisory verdict of the jury and in the sentence imposed by the *409 trial court. Our independent weighing of the aggravating and mitigating circumstances convinces us that death is the proper sentence in this case. Considering the circumstances of the crimes committed and the defendant, we find that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
The appellant's convictions and the sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Presiding Judge.
On application for rehearing of our opinion issued on June 28, 1991, wherein we reviewed and affirmed the sentence of death, the appellant raises three issues.

I.
The appellant first contends that this court could not affirm her sentence of death entered again after our remand because a motion for new trial was pending in the lower court and, also, because we did not have a transcript of the "resentencing" proceedings.
In regard to the appellant's assertion of the invalidity of our affirmance because we had no transcript of the "resentencing" proceedings, we note that the appellant is correct in observing that we had no transcript of any further proceeding at the time of our ruling. However, the record on return to remand contained the trial court's sentencing order, fully complying with §§ 13A-5-47(d) and (e), Code of Alabama 1975. Moreover, out of an abundance of caution, after the appellant filed her rehearing brief, we ordered the transcript to be filed with this court. We have reviewed that transcript and find nothing, including plain error, that would, in any way, call into question our affirmance of the appellant's death sentence. See A.R.App.P. 45A.
In regard to the appellant's assertion that this court could not rule because a motion for new trial was still pending in the lower court, we first want to make clear, so as to erase all ambiguity and confusion, that when we remanded this cause, we intended only that the trial court declare whether it had considered the victim impact statement in the presentence report and, if it had, resentence the appellant without any consideration of that statement. We did not contemplate any proceeding beyond this narrow point, and we certainly did not contemplate a complete reopening, as the appellant urges. While we admit that our instructions on remand could have been more specific,[1] we do not think that they could have reasonably been construed to authorize the trial court to open the proceedings beyond its declaration of its consideration of the victim impact statement and, if it considered the statement, its resentencing the appellant without considering it. Because we find that our instructions gave the trial court no authority to consider a motion for new trial, we find the appellant's assertion to be without merit. See Murry v. State, 562 So.2d 1348, 1362 (Ala.Cr.App.1988). See also §§ 13A-5-53(a) and (d)(2).
In addition to finding that the trial court had no authority to consider the motion for new trial and that, thus, the motion could in no way affect our jurisdiction to review, we note that the grounds of the appellant's motion for new trial are clearly without merit. Contrary to the appellant's assertion, our instructions did not mandate or even authorize a new sentencing proceeding. See citations above and Ex parte Cochran, 500 So.2d 1064 (Ala.1986). We also find that notice of the hearing was sufficient because of the nature of the proceedings, as restricted by our instructions. In regard to the appellant's grounds that she was not allowed to present new evidence in favor of a life sentence and that a new presentence investigation should have *410 been ordered to reflect this new evidence, we again note that our instructions did not encompass this. In regard to the appellant's assertion that she did not receive a fair sentencing because the present sentencing findings are identical to the previous order with the exception of the notation that the victim impact statement had not been considered in the first sentencing, we find that the similarity buttresses the trial court's declaration that, in the initial order, it had not considered any victim impact evidence and, thus, warrants further belief in the reliability of the trial court's findings. We also find to be without merit the ground that the trial court erred in denying the appellant's motion for recusal of the trial judge.

II.
The appellant further contends that the jury should have been instructed that it must determine whether Martha Henderson was an accomplice and that, if it determined that she was, her testimony must be sufficiently corroborated to be considered. We have already found this issue to be without merit. Haney v. State, Opinion at 400. We again note that no request for these instructions was made in the lower court. This offers some indication that even defense counsel did not regard Henderson as a possible accomplice. The absence of these instructions does not constitute plain error.

III.
The appellant raises, for the first time, the contention that the jury instructions on reasonable doubt violated the United States Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). This issue must be reviewed under the plain error standard because no objection was presented.
In defining "reasonable doubt" in the guilt phase of the trial, the trial court used the phrases "moral certainty" and "actual, substantial doubt." The portion of the jury instructions complained of is as follows:
"Now in answer to the charges embraced in the indictment, the defendant has entered a plea of not guilty. Therefore, the burden of proof is on the State of Alabama. The defendant is always presumed to be innocent and the fact that she has been indicted, arrested and brought before the bar of justice does not create any presumption against her at all. She comes into Court clothed with this presumption of innocence, and this remains with her throughout the trial as a matter of evidence. It is an evidentiary fact which is to be considered by you and it goes with her until it is overcome by the evidence which proves her guilt to each of you beyond a reasonable doubt and to a moral certainty. Now you will want to know what a reasonable doubt is. When I say that the State is under the burden of proving guilt beyond a reasonable doubt and to a moral certainty, that does not mean that the State must prove an alleged crime beyond every imaginable or speculative doubt or beyond all possibility of mistake, because that would be impossible. A reasonable doubt means an actual, substantial doubt. It could arise out of the testimony in the case or it could arise from the lack of testimony in the case. It is a doubt for which a reason can be assigned, and the expression to a moral certainty means practically the same thing as beyond a reasonable doubt because if you are convinced to a point where you no longer have a reasonable doubt, then you are convinced to a moral certainty.
"Now there has been some evidence offered in this case which is called circumstantial evidence. The test of the sufficiency of circumstantial evidence is whether the circumstances as proved produce a moral conviction to the exclusion of all reasonable doubt of the guilt of the defendant. But there cannot be a conviction upon circumstantial evidence, unless to a moral certainty it excludes every other reasonable hypothesis than that of the guilt of the accused. No matter how strong may be the circumstances, if they can be reconciled with the theory that the defendant is innocent, then the guilt of the accused is not *411 shown by the full measure of proof required and the defendant should be acquitted."
In the sentence phase of the trial before the jury, the trial court instructed the jury that the burden was on the state to prove "beyond a reasonable doubt and to a moral certainty" that one or more aggravating circumstances should exist before it would be authorized to recommend a death sentence.
The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the Supreme Court found that a jury charge that defined "reasonable doubt" by using the phrases "grave uncertainty," "actual substantial doubt," and "moral certainty" could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. In holding that the instruction was contrary to the "beyond a reasonable doubt" requirement stated in In re Winship, the Court stated:
"In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole. Francis v. Franklin, 471 U.S. 307, 316 [105 S.Ct. 1965, 1972, 85 L.Ed.2d 344] ... (1985). The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a `grave uncertainty' and an `actual substantial doubt,' and stated that what was required was a `moral certainty' that the defendant was guilty. It is plain to us that the words `substantial' and `grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. When those statements are then considered with the reference to `moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause."
498 U.S. at___, 111 S.Ct. at 329-30 (footnote omitted).
In reviewing the reasonable doubt instructions in this case, we do so in the context of the charges as a whole. Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of reasonable doubt in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered prejudicial enough to permit reversal. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); United States v. Moss, 756 F.2d 329 (4th Cir.1985).
In Cage, the Court found that the use of the words "grave" and "substantial" in the expressions "grave uncertainty" and "actual substantial doubt" suggested a higher degree of doubt than is required for acquittal under the reasonable doubt standard. The Court further found that the use of such expressions in conjunction with the expression "moral certainty" could lead a reasonable juror to interpret the instruction to allow a finding of guilt based on proof below that required by the Due Process Clause. Obviously, it was not the use of any one of these terms, but rather the combination of all three, that rendered the charge unconstitutional in Cage. See Gaskins v. McKellar, ___ U.S.___, 111 S.Ct. 2277, 2277, 114 L.Ed.2d 728 (1991) (wherein, in a memorandum opinion, Justice Stevens stated that he thought the Court correctly decided not to grant certiorari on the question of whether Cage announced a new rule, because the jury instructions to be reviewed did not contain the specific language condemned in Cage that a reasonable doubt "must be a doubt as would give rise to a grave uncertainty"). In the instant case, the trial court did use the words "actual, substantial doubt" and "moral certainty" in its explanation of reasonable doubt; however, it did not use the phrase "grave uncertainty" which was used in *412 Cage. Thus, this case is distinguishable from Cage. The use of some, but not all, of the phrases examined in Cage does not necessarily constitute reversible error.
In reviewing the instant reasonable doubt instructions in the context in which they were given in the charges as a whole, we do not find that these instructions contain the same flaw condemned by the Supreme Court in Cage. Although the words "actual, substantial doubt" and "moral certainty" were used in the instant instruction in the guilt phase of the trial, and only the phrase "moral certainty" in the sentence phase, the use of these phrases does not, in our view, cause the same problem that the Court found with the instruction in Cage. We think that the definition of reasonable doubt given the jury in this case correctly conveyed the concept of reasonable doubt and was not misleading or confusing. The trial court's instructions on the presumption of innocence, the burden of proof, and its equating the meaning of "moral certainty" with "reasonable doubt" supports this conclusion. We find that the questioned instructions were proper and not constitutionally deficient, as contended by the appellant. There is no plain error here.
We note that the questioned instructions substantially followed the pattern jury instructions recommended by the Alabama Supreme Court and in effect at the time.[2] Our supreme court has stated, "[W]e do not think we should hold that the trial judge plainly erred when he instructed the jury pursuant to a pattern jury instruction `recommended' by this Court, especially in the absence of an objection or request from the defendant." Ex parte Harrell, 470 So.2d 1309, 1315 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985) (emphasis in original).
Having considered all matters raised by the appellant in her application for rehearing as well as the additional arguments presented and finding them to be without merit, we overrule the application for rehearing.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All Judges concur.
NOTES
[1] Section 13A-5-46(f), Code of Alabama 1975, requires that an advisory verdict recommending death be based on a vote of at least 10 jurors.
[2] Jerry Paul Henderson was tried first for the capital offenses of murder for hire, § 13A-5-40(a)(7), and murder committed during a robbery in the first degree, § 13A-5-40(a)(2), arising out of the death of Jerry Wayne Haney; convicted of both offenses, as charged, after a jury trial; and was sentenced to death. His convictions were affirmed on appeal by this court, Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990).
[3] Moreover, as we noted in our review of Henderson's conviction and sentence, even though the trial court did not find the crime to be heinous, atrocious, or cruel, "the facts ... could have supported a finding of heinous, atrocious, or cruel," 583 So.2d at 299.
[4] The Florida death penalty statute construed by the Court in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), is similar to Alabama's statute. In each, upon a defendant's conviction of a capital offense, the trial court conducts a separate sentencing proceeding, after which the jury renders an advisory verdict. The ultimate decision to impose a sentence of death, however, is made by the court, after finding at least one aggravating circumstance. If the court imposes a sentence of death, it must set forth in writing its findings upon which the sentence of death is based.
[5] This original findings and sentencing order of the trial court dated November 18, 1988, and the findings and sentencing order contained in the return to remand dated April 29, 1991, are identical except for a statement of the trial court in the second findings and sentencing order that it did not consider the victim impact statement in either instance.
[1] We instructed that the trial court resentence the appellant without considering the victim impact statement and issue new written findings.
[2] Alabama Pattern Jury Instructions: Criminal (Alabama Bar Institute for Continuing Legal Education 1980).